Hoeller v. Haffner.

---

HOELLER v. HAFFNER et al., Appellants.

Division One, March 30, 1900.

155    589
169    ¹135

1. **Equity:** APPELLATE PRACTICE. In equity cases the finding of the trial court will be accorded proper consideration, but as the ultimate responsibility for the judgment rests upon the appellate court, that court is not bound by the trial court's finding of facts, but will review the evidence and render such judgment as good conscience dictates.

2. ———: DIVESTING TITLE: CASE ADJUDGED. The evidence in this case is fully reviewed, and *held*, not to sustain the action of the trial court in divesting the title to the lots in controversy out of defendant and vesting it in plaintiff.

3. **Fraud: CIRCUMSTANCES.** Fraud is an affirmative fact to be proven, not presumed; and while fraud may be deduced from circumstances, they must be such as to exclude every reasonable hypothesis of fair dealing; and if the circumstances are as consistent with honesty as with fraud, the transaction should be upheld.

Appeal from Gasconade Circuit Court.—*Hon. P. Steele Ryors*, Special Judge.

REVERSED.

*J. C. Kiskaddon* and *August Meyer* for appellant.

(1) While deference is shown to the decision of the circuit judge, an equity case appealed is practically for hearing in the appellate court, and will be considered as if it had originated there, and was to be heard for the first time. Blount v. Spratt, 113 Mo. 48; Lins v. Leonhardt, 127 Mo. 271; Warren v. Ritchie, 128 Mo. 311; Morey v. Staley, 54 Mo. 419. (2) And the appellate court will review both the law and the facts. Felton v. Gregory, 104 Mo. 488; Knapp v. Knapp, 127 Mo. 53. (3) And if the finding of the trial court is erroneous will disregard, review and correct it. Mellier v. Bartell, 106 Mo. 381; Campbell v. Hoff, 129 Mo. 317; Cornett v. Bertelsmann, 61 Mo. 118; Drosten v. Mueller, 103 Mo. 624; Fulkerson v. Sappington, 104 Mo. 472. (4) Frand can never be presumed; it must be proved; and the burden is on him who alleges a transaction to be fraudulent to clearly prove it by substantial evidence. Robinson v. Dryden, 118 Mo. 534; Renney v. Williams, 89 Mo. 139; 8 Am. and Eng. Ency. of Law (1 Ed.), 654; 19 Am. and Eng. Ency. of Law (1 Ed), 42. (5) If a transaction consists as well with an honest and fair purpose as with a fraudulent one, it will be referred to the better motive. Robinson v. Dryden, 118 Mo. 534; Garesche v. McDonald, 103 Mo. 1; Webb v. Darby, 94 Mo. 621; Chapman v. McIlwrath, 77 Mo. 38; Page v. Dixon, 59 Mo. 43. (6) And when doubt exists as to the construction to be given to the conduct of the parties, it should be resolved in favor of defendants. Webb

v. Darby, 94 Mo. 621; Chapman v. McIlwrath, 77 Mo. 38. (7) The relationship of the parties, or the insolvency of the person charged with the fraud, or both, are insufficient to establish a fraudulent intent. Renney v. Williams, 89 Mo. 139; Robinson v. Dryden, 118 Mo. 534.

*B. L. Matthews* and *John W. Booth* for respondents.

MARSHALL, J.—This is a proceeding in equity to divest the title to lots 18, 20, 22 and 24 on West 5th Street, in the town of Hermann, out of the defendant Martha Haffner, wife of Julius Haffner, and vest it in the plaintiff.

The facts developed on the trial are these: Julius Haffner became indebted to the plaintiff prior to March, 1892, and on the 13th day of April, 1896, he obtained judgment against Julius Haffner, in the circuit court of Gasconade county, for $703.95, and caused the execution issued thereon to be levied by the sheriff on this property and at the execution sale he became the purchaser thereof for five hundred dollars. Then he instituted this action against Julius Haffner and Martha his wife alleging that the property belonged to Julius and that the title thereto had been put in the name of Martha to defraud his creditors, and that Julius had since made permanent and valuable improvements thereon, and therefore he asked to have the title divested out of them and vested in him. The answer of Julius is a general denial. Martha Haffner answered separately and claimed that she purchased the property on the 28th of March, 1892, with her separate money and means which come to her by gift during coverture, and which money had never been reduced to possession by her husband by her assent in writing, and that the improvements were made on the property by her with money she borrowed from other persons and for which she is still indebted. Anna M. Rhodius, the mother of Mrs. Haffner, was made a party defendant upon her own motion, and filed

an answer in which she set up that the property was purchased by her daughter with five hundred dollars, cash, which she gave to her daughter; that afterwards her daughter built a dwelling house on the land, and to assist her in so doing she loaned her daughter six hundred dollars on the 4th of October, 1892, and a further sum of six hundred dollars on the 1st of November, 1892; which was so applied; that on the 28th of November, 1892, her daughter borrowed one thousand dollars from the Mutual Saving Fund Association, of Hermann, and gave her note therefor, secured by deed of trust · on this property, her husband, Julius, joining therein, and that on the 28th of March, 1895, she, Mrs. Rhodius, purchased the note and mortgage from that association and still holds it, and that it is unpaid; that she made the gift and loans and purchased the note and mortgage because she is a widow, with minor children, engaged in the hotel business and she intended to provide a home for her daughter, herself and her other children in case she quit the hotel business; and therefore she prays that her interests in the property be protected.    The reply to the separate answers is a general denial.

The plaintiff proved by Robert Walker, an attorney-at-law, that in 1888, the defendant, Julius, who is a doctor, came to Hermann and bought Dr. Freyman's practice and has practiced medicine there ever since; that he had a horse, buggy, some household furniture, something of a library and a good assortment of drugs; that he paid his current bills promptly but was insolvent and that witness had been unable to collect anything from him on account of some notes that had been sent him for collection; that the property in question, with the improvements, is worth about $2,000. Over the objection of the defendants this witness was permitted to testify that Dr. Haffner's practice was worth a thousand dollars a year at least.

The plaintiff then showed by the records from the probate court, that letters of administration were refused Mrs. Rhodius on her husband's estate, on the 4th of August, 1890.

Charles Hansen testified that he sold the land to Dr. Haffner for four hundred and fifty dollars; that Dr. Haffner handed the money to Mr. Wensel and he handed it to him, Hansen; that he did not remember whether the deed was made to Dr. Haffner or to his wife.

Albert Schubert, a carpenter and builder, testified that he built the dwelling house; that he started in October, 1892, and finished it in the spring of 1893; that he made a verbal contract with Dr. Haffner to build the house for $2,100; that the doctor paid him in installments as the work progressed; that there was a stable on the premises worth $75, a cistern worth $20 to $30, a cellar worth $30 to $40, and that the painting of the house would cost $75 to $80; that in his opinion the whole improvements on the place would cost about $2,600 to $2,800.

The plaintiff then introduced in evidence the deed from Charles Hansen to Martha Haffner, dated March 28, 1892, and recorded October 5, 1892.

The defendants then admitted the indebtedness of Doctor Haffner to the plaintiff contracted long prior to the purchase of this property and based on a note dated January 1, 1887, the judgment and sale under the execution, "and that on and before March 25, 1892, said Julius Haffner was and yet is insolvent," but in making these admissions denied that the Doctor had any right, title or interest in the property.

This was the whole of plaintiff's case.

The testimony adduced by defendants established these facts: 1. Dr. Haffner located at Hermann, about 1888. He bought Dr. Freyman's practice for $250, and borrowed that

sum from the bank to pay for it. He could not pay the note at maturity, but upon its renewal, paid it when it fell due. He had only eight or ten dollars in money, a crippled horse and some household furniture when he reached Hermann. He was then a married man with at least one son. Sometime before the spring of 1890, his wife secured a divorce from him and he had to pay her five hundred dollars alimony, and fifty dollars costs and fees. He also paid two hundred dollars debts his wife had contracted in Jefferson City. He also had to buy a horse and cart, for which he paid one hundred and forty dollars. He helped to support his mother and sister, contributing thereto from one hundred and fifty to two hundred and fifty dollars a year. His son was studying medicine in St. Louis, and between 1888 and 1892 he paid for him between twelve and fifteen hundred dollars. In the spring of 1890 he married Martha Haffner, who was at the time of her marriage, suffering with an ovarian tumor, which grew worse, and upon the advice of Dr. Bauer of St. Louis, she was operated upon in a hospital in St. Louis. This, and the expense incident thereto, cost him about six hundred dollars. He stated that he had a good practice but did not state and was not asked to state how much it amounted to annually. He testified that he had no money with which to buy the land in controversy or to construct the improvements thereon, but that the $2,700 that was expended for that purpose consisted of five hundred dollars that his wife's mother gave his wife, twelve hundred dollars which she loaned his wife and one thousand dollars borrowed by his wife from the Mutual Saving Fund Association, which together with some work that was done on the place by persons who were indebted to him and who could not pay him in any other way, brought up the total cost of the land and improvements to $2,769; that he acted as the agent of his wife in the purchase of the land and in the erection of the improvements

and that the money which paid for the same was hers, derived as above stated.

. 2.   Mrs. Martha Haffner testified to the same effect as to the money her mother gave her, the money she borrowed from her mother and from the Savings Association, and that her husband acted as her agent, but that she had never given her assent, in writing or otherwise, to her husband to reduce the money she so obtained to his possession.

3.   Mrs. Anna M. Rhodius testified that her husband died in February, 1890, that she received from his estate between eight hundred and a thousand dollars; that she received from three policies on his life, three thousand nine hundred and two dollars and seventy-four cents; that she lived on the farm a year after her husband's death, and then went to St. Louis; that she then had about five thousand dollars; that she remained in St. Louis about three months and spent one hundred and fifty dollars while there; that she then returned to Hermann and in July, 1891, she bought a hotel, called the "White House," from A. C. Leisner, for twenty-eight hundred dollars; that she had good success in business and took in as much as eleven hundred dollars one month; that she gave her daughter five hundred dollars in March, 1892, with which to buy the land in question, and loaned her six hundred dollars in October, 1892, and six hundred dollars in November, 1892, with which to help build the house, and on the 28th of March, 1895, she purchased the note for one thousand dollars and the mortgage securing the same, given by her daughter and her husband to the Mutual Savings Fund Association, and still owns the same.   On this note was an indorsement, "Interest paid in full with one hundred and twenty dollars up to March 28th, 1897."

She kept an account with the Hermann Savings Bank, and her account with that bank from July 16, 1891, to April

13, 1896, was offered in evidence, from which it appeared that she deposited in that bank on July 16, 1891, four hundred dollars and eighty-five cents; that during the year 1891 she had a constant balance to her credit in the bank of from nine hundred to eleven hundred dollars; that during 1892 her balance ran from one hundred dollars to twelve hundred dollars; that during 1893, it varied from forty-one dollars to about six hundred dollars; that in 1894 it varied from one hundred and fifty dollars to three hundred and seventy-five dollars; that in 1895 it varied from seven dollars to three hundred and seven dollars, and in 1896 she drew out the balance of two hundred dollars she had in the bank.

The cashier of the bank corroborated her statement as to the $3,902.74 she received from the policies on her husband's life, and as to various bond investments he made for her, and as to her deposits and balances in the bank.

Leisner, from whom she bought the hotel, testified that the hotel ought to net, clear of all expenses, from one hundred and fifty to two hundred dollars a month.

4. Judge Wensel testified that in the spring of 1892 Charles Hansen applied to him to help him sell the land in controversy, and that hearing that Dr. Haffner was dissatisfied with the place at which he was then living, he spoke to him about buying it; that the Doctor said he would see the women folks about it; that it resulted in a trade, and the Doctor handed him $450—most of it in gold—and directed him to make the deed to his wife, which was done. Mrs. Rhodius testified that the five hundred dollars she gave her daughter was "mixed" money, and Mrs. Haffner testified it was "some silver and some paper" money, and that she did not think any of it was gold.

Upon this showing the circuit court divested the title out of Martha Haffner and vested it in the plaintiff, subject to the lien of the mortgage on which a balance of $840, with interest from March 28, 1897, was found to be due, and

ordered the property to be sold to satisfy the mortgage, and the excess to be turned over to the plaintiff. After proper steps Dr. Haffner and his wife appealed.

## I.

In equity cases the judgment of the trial court will be accorded all proper consideration but as the ultimate responsibility for the judgment rests upon the appellate court, when the case is appealed, that court is not bound by the findings of fact by the trial court but will review the evidence and render such judgment as good conscience dictates. This is the settled law in this State. [Drosten v. Mueller, 103 Mo. 624; Blount v. Spratt, 113 Mo. 48; Warren v. Ritchie, 128 Mo. 311; Dunn v. McCoy, 150 Mo. 548.]

## II.

The only evidence offered by the plaintiff to show that the land and improvements belong to Dr. Haffner consists of the fact, 1st, that Hansen swore that he, the Doctor, handed the four hundred and fifty dollars to Judge Wensel and the judge handed the money to him, and 2d, that the Doctor contracted with Schubert to build the house, and that he paid Schubert the installments from time to time. There is absolutely no evidence whatever that one cent of of the money belonged to the Doctor. On the other hand Doctor Haffner, Mrs. Haffner and Mrs. Rhodius all testify to the gift of the five hundred dollars by Mrs. Rhodius to her daughter to buy the land, and of the loan of the twelve hundred dollars to help build the house, and of the one thousand dollars borrowed by Mrs. Haffner from the Savings Association to complete the house. The plaintiff introduced no countervailing evidence, but to overcome this direct testimony refers to the bank account of Mrs. Rhodius to show

that she did not check out any such sum as five hundred dollars in March, 1892, but that she had a balance of $821.77 on the 24th of March, 1892, and further that on October 3, 1892, she had a balance of $702.14 and drew out $150 that day, and on November 2, 1892, she had a balance of $534.99 and drew out $125.65 that day, and also to the fact that Mrs. Rhodius says the five hundred dollars was "mixed money" and Mrs. Haffner says it was "some silver and some paper" money, and she did not think any of it was gold, while Judge Wensel says most of the four hundred and fifty dollars was gold, and upon this foundation plaintiff builds his claim that these witnesses all testified falsely as to the ownership of the money and that therefore it was the Doctor's money. In this connection it should be noted that Mrs. Rhodius stated that she did not keep all her money in the bank but kept some in her room, and her daughter corroborates her mother, with only this difference, one said it was kept in a safe and the other said it was kept in a desk in the room.

These discrepancies in the testimony together with the fact that Mrs. Rhodius' bank account does not show that she drew out the several sums of money at the specified dates and the fact that the Doctor paid the money to Wensel and Schubert is the sole foundation for the plaintiff's charge that the money invested belonged to the Doctor.

As against this it is conceded that the Doctor was insolvent when he settled in Hermann in 1888, and that he has been insolvent ever since. If it be true as plaintiff showed, and that is all the evidence on that subject in the case, that the Doctor earned a thousand dollars a year, then in the four years from 1888 to 1892 when this property was bought and improved he would have earned four thousand dollars. But it is uncontradicted that during that four years he expended the following sums: Note given to buy Dr. Freyman's

practice, $250; alimony and costs paid his first wife, $550; debts contracted by his first wife, $200; horse and cart, $140; contributed to the support of his mother and sister, $600; furniture purchased before second marriage, $50; operation on his second wife, one-third of the total, $200; aggregating $1,990. Deducting this from the four thousand dollars he is thus assumed to have earned in the four years leaves $2,010. Now if the $1,700 which was paid for the land and improvements (outside of the $1,000 borrowed from the Savings Association) was paid by the Doctor out of the $2,010 thus remaining, it would leave him $310 to support his family on for four years, or $77.50 a year. And this does not take into account the money spent for the medical education of his son. Upon this showing the Doctor can not reasonably be said to have been overburdened with money nor to have been in a condition to spend seventeen hundred dollars in buying land and building a house.

Now turn the picture around and see whether Mrs. Rhodius was financially able to give her daughter five hundred dollars and lend her twelve hundred dollars in 1892. In 1891 when she went to St. Louis, she had $5,000. She stayed there three months and spent $150. She then returned to Hermann with $4,850. In July, 1891, she bought the White House for $2,800. This left her $2,050 of her $4,850. The net profits of that hotel were $150 a month at the least. So that from July, 1891, to March, 1892, she had added $1,050 to her remaining capital of $2,050, which would make her cash $3,100. In March, 1892, she gave her daughter $500, which reduced her cash to $2,600. Between March and October she added $900 to her $2,600 which would make her cash $3,500. In October she loaned her daughter $600 and in November $600 more. Deducting this $1,200 from the $3,500, would leave her $2,300 in cash.

Upon this theory, supported as it is by direct and posi-

tive testimony, it is as easy to figure how the $1,700 could have been furnished by Mrs. Rhodius as it is impossible to figure how it could have been furnished by Dr. Haffner.

Mrs. Rhodius' financial condition and status is conceded and established by testimony outside of her own or of her family, and it will not do to brush all this aside because she or her daughter or both were mistaken, or worse, when they said the five hundred dollars was silver and paper and not gold, while Wensel said it was mostly gold, nor to say the receipts for the two loans of six hundred dollars each were shams and frauds because the paper on which they were written looked clean and fresh in 1897, although the receipts were dated in 1892, especially in view of the testimony that the receipts had been kept in Mrs. Rhodius' desk.

Fraud can not always be proved by direct testimony but may be shown by circumstances which exclude every other reasonable hypothesis, but the suspicions and inconsistencies pointed out and relied upon by the plaintiff are not sufficient to overcome the positive, direct and highly reasonable testimony in this case, that Mrs. Rhodius was able to and did furnish the money and that Dr. Haffner was not able to do so and did not furnish it. Nor have we overlooked the fact that Mrs. Rhodius' bank account does not show that she drew out from the bank the several sums given and loaned by her to her daughter, on or about the dates specified. That account shows that she drew out $150 on October 4, 1892, the day before she loaned the first $600, and that she drew out $125.65 on November 2d, 1892, the day after she loaned the second $600. But if it did not show that she drew anything from the bank at or about those dates, the fact is still uncontradicted that she had more money than she loaned at those dates, and was the only person connected with the transaction who did have any money or sufficient money to pay for the land and improvements. Moreover the trial

court found that she owned the note and mortgage and adjudged that there was a balance due on the note of $840. She purchased this note from the Savings Association on the 28th day of March, 1895, yet her bank account showed that on January 5th, 1895, her balance was only $7.00 and that she drew that out of the bank on February 6, 1895, and had no balance in the bank until December 24, 1895, when she deposited $200. Again, it is conceded that she paid Leisner $2,800 for the "White House" on July 15, 1891, yet she had no bank account on or before that date, but it is unquestioned that she had $4,850 in money, which she kept somewhere other than in a bank. On the next day, July 16, 1891, she opened an account at the bank and deposited $400.85, which grew to $675.85 balance on July 24th. All of which shows very clearly that she did not keep all her money in the bank. In fact the whole bank account is very persuasive that this is true.

Upon the conceded and uncontradicted testimony in this case it seems very plain that Dr. Haffner did not furnish the money to buy or improve this property, but that Mrs. Rhodius did so, and that she has invested, outside of the five hundred dollars given to her daughter, the twelve hundred dollars she loaned her daughter and the $840 she paid to take up the mortgage, and that her daughter justly owes her mother that amount, and that the property belongs to Mrs. Haffner and not to Dr. Haffner.

For these reasons the judgment of the circuit court is reversed. All concur, except *Robinson, J.*, absent.