## MYERS, Appellant, v. SCHUCHMANN et al.

### Division Two, May 31, 1904.

1. **ACCRETIONS: Connection With Riparian Land.** Plaintiff claimed title to 160 acres of land which had been formed as a bar in the river, as an accretion to a small piece of two or three acres of old land which he claimed had never washed away, the title to which he had acquired. *Held,* that he must not only show that the small piece did not in fact wash away, but he must show that the 160 acres in suit was an accretion to that small piece.

2. ———: ———: **Conflict In Evidence: Deference to Trial Court: Equitable Defense.** A suit in ejectment to which defendants set up an equitable defense, and seek affirmative relief, is converted thereby into an equitable action. And in such case, if the evidence is conflicting on the point as to whether the land was an accretion to land which plaintiff claims to own, the appellate court will defer somewhat to the findings of the chancellor, but is not bound thereby, but will review the evidence and render such judgment as it warrants.

3. ———: ———: ———: **This Case.** The evidence in this case, which is ejectment with an equitable defense, is reviewed and held to preponderate in favor of defendants, and does not show that the land in suit was an accretion to plaintiff's land.

4. ———: **Title By Limitation.** Actual, open, continuous, notorious, adverse and hostile possession of the land in suit for ten years before the institution of the suit gives the defendant title by the statute of limitations, and the inclosing of "made" lands by a substantial fence and the reducing of the lands to such uses as they may be put to, constitute possession.

5. **CONVEYANCE: Purchase With Notice of Adverse Possession.** One who purchases land with actual notice and knowledge that it is in the actual, open and notorious possession of others, is chargeable with notice of whatever title those others have previously acquired from his grantor. And if those others have previously acquired the land by an unrecorded written contract, and are in possession at the time he purchases, he can not recover it in ejectment.

Appeal from Carroll Circuit Court.—*Hon. Jno. P. Butler,* Judge.

AFFIRMED.

*Kinley & Kinley* with *L. Benecke* and *F. C. Sasse* for appellant.

(1)   The body of land to which plaintiff showed paper title was not all washed away by the Missouri river, there being a small portion of the original land left, together with a large amount of accretions that had formed before the river cut away the greater part of Saline Point.   Then the action of the river by accretion re-formed against the part so left, the original land, and hence plaintiff was entitled to at least the original amount of land embraced in his deeds.   Berne v. Miller, 149 Mo. 228; Gorton v. Rice, 153 Mo. 676; McBaine v. Johnson, 155 Mo. 191; Minton v. Steele, 125 Mo. 190; Adams v. Spivey, 94 Ga. 626; Freeman, Coten. and Part. (2 Ed.), secs. 298-408.   (2)  The formation of bars in the old channel of the Missouri river between the Carroll county shore where Balch's land reached the water's edge and the remaining portion of Saline Point and the connection of these bars each with the other by gradual deposits and the final attaching of same to Carroll county would not make the land in question an accretion to the land in Carroll county that extended to the original water's edge; hence neither Balch nor defendants in any event had any claim to the land in controversy.   Benson v. Morrow, 61 Mo. 353; Perkins v. Adams, 132 Mo. 140; De Lassus v. Faherty, 164 Mo. 373; Huhn v. Dawson, 134 Mo. 591.   (3)  W. A. Snell claiming to own one-eighth of the land in controversy at the time plaintiff made the compromise of the litigation with Balch and being in possession thereof, gave no constructive notice thereby of more than his claim.   The occupancy of land by one tenant in common gives no constructive notice of his cotenant's claims.   (4)   Myers' inquiring of Snell as to ownership of the land and being informed by him that he, Snell, claimed one-eighth and Balch seven-eighths thereof, and the contract under which defendants claim being unrecorded, left plaintiff

without notice of defendants' claim to the land. (5) Plaintiff had the paper title to the land in question, and judgment should have been in his favor for its recovery, notwithstanding, in settlement of the litigation between him and Balch, he received a deed from Balch to the land in question. This did not place him in position of claiming title to the land under Balch, and having the superior title, he could impeach the Balch title. McBaine v. Johnson, 155 Mo. 191; Sell v. McAnaw, 138 Mo. 191; Smith v. Lindsay, 89 Mo. 76; Chillicothe v. Burr, 185 Ill. 322; Sedgwick & Wait's Trial Title Land (2 Ed.), sec. 803; Frey v. Ramsour, 66 N. E. 466; Christenberry v. King, 85 N. C. 229; Henry v. Reichert, 22 Hun (N. Y.) 394; Hunt v. Searcy, 167 Mo. 159.

*Tyson S. Dines* and *Perry S. Rader,* respondents, *pro se.*

(1) The testimony of plaintiff's witnesses does not even tend to show that the small piece of the original Saline county land which they say never washed away was on either of the lots described in plaintiff's petition. (2) Even if there was a small piece of land which never washed away, no connection between it and the land in suit, which is admitted to be "made" land, was shown. On the contrary, by plaintiff's own witnesses, Dye and Watkins, it is made clear that the Loblolly lake, which they describe as formerly the bed of the Missouri river, now runs between that small strip of land and the land in suit, and hence the land in suit could not be an accretion to that small piece, even if that small piece was shown to have been purchased by plaintiff. (3) Plaintiff claims by purchase of the Keyte land, and the testimony of Kennedy that all the Keyte land washed away is not disputed by any witness, and hence, even if there was a small strip of the original Saline land that never washed away, plaintiff has shown no title to it. (4)

There is no evidence whatever that the land in suit is an accretion to the small piece of land which never washed away. Even if the testimony of some of plaintiff's witnesses that the river cut through, leaving a piece of the old land on the north side of the river, can be believed, yet that same testimony shows that that small piece lay far north of the land in suit, and there is not a particle of evidence that the bar was extended from that piece on southwest until it included the land in suit. It could not, therefore, be an accretion to that land. (5) The evidence of defendants is that the land in suit is a part of a bar that began on the southeast side of the old land in section sixteen in Carroll county and was extended gradually through the years on eastward and northeast until it embraced the land in suit, and hence it was an accretion to section 16, and whatever was the title of that section was the title to this land in suit (Campbell v. Laclede Gas Co., 84 Mo. 352), and hence, as Balch bought from the Darrs section 16 and "all made land thereto pertaining and belonging," he bought the title to the land in suit. (6) Even though plaintiff showed a perfect paper title to the land in suit, and even though it was not an accretion to the old land in section 16, the judgment for defendants should be sustained on the ground that there was substantial evidence that defendants and their ancestor, Balch, had been in continuous possession of this land for more than ten years before Myers obtained his deed from Balch on March 3, 1900, and that these defendants had been in possession as purchasers from Balch three years prior to that time. It was not necessary to specially plead that defense. Campbell v. Laclede Gas Co., 84 Mo. 352; Coleman v. Drane, 116 Mo. 387. (7) One who accepts a deed from a former owner of land with knowledge that another is in possession or with such knowledge of that possession as would put a man of ordinary prudence upon his inquiry as to the extent and character of the occupier's possession, can under his deed assert no right to the

land that his grantor could not successfully have asserted at the time he made him the deed. Desteiguer v. Martin, 162 Mo. 417; Martin v. Jones, 72 Mo. 26; Freeman v. Moffitt, 119 Mo. 302; Davis v. Briscoe, 81 Mo. 37; Stephenson v. Kilpatrick, 166 Mo. 262; Davis v. Wood, 161 Mo. 18; Westminster College v. Piersol, 161 Mo. 270.

BURGESS, J.—This is an action of ejectment for the possession of the southeast quarter of section fifteen in township fifty-three of range twenty west, in Carroll county, Missouri.

The defendant Schuchmann was at the time of the institution of the suit the tenant in possession of his cotenants, Rader, Dines and Davis. The three last named answered jointly, and in their answer admit the possession of the land, but deny all other allegations in the petition. The answer then proceeds as follows:

"These defendants state that plaintiff claims land in controversy under and by virtue of a deed of Samuel Balch, dated March 23, 1899. The defendants aver that the land in controversy was not intended by the parties thereto to be included in said conveyance, and that, if it was included therein, it was done under a mistake and without any purpose or intention on the part of the grantor of conveying the same thereby, was wholly without consideration to support the same, and was in fraud of the rights of these defendants as hereinafter pleaded.

"Defendants state that long prior thereto, to-wit, in October, 1895, by virtue of a written contract, signed and executed by Samuel Balch, John M. Davis, James W. Davis, Perry S. Rader and Tyson S. Dines, the said Samuel Balch sold to these defendants and to John M. Davis all his right, title and interest in and to certain undivided interests in the land in controversy, as follows: To Perry S. Rader an undivided one-sixth interest in said land; to James W. Davis an undivided one-sixth interest in said land; to Tyson S. Dines an un-

divided one-sixth interest in said land; to John M. Davis an undivided one-half interest in said land. These defendants state that the sale to John M. Davis of the undivided one-half interest in said land was a clerical mistake and that the contract was intended to sell, and in fact the said Samuel Balch did thereby sell to John M. Davis an undivided one-fourth interest in said land. That by virtue of the sale of said interests by Samuel Balch by the said contracts, the said Samuel Balch thereby remained the owner of an undivided one-eighth interest in said land, having theretofore sold an undivided one-eighth interest by a prior conveyance to William A. Snell.

"These defendants state that afterwards, in the year 1896, the said Samuel Balch by verbal contract sold to said Tyson S. Dines his remaining one-eighth interest in said land, and thereupon the said Tyson S. Dines became the owner of an undivided one-eighth interest, and an undivided one-sixth interest in said land, or a total of an undivided seven twenty-fourths interest therein.

"That afterwards, in the year 1896, the said John M. Davis by verbal contract sold to James W. Davis his undivided one-fourth interest in said land, so thereupon the said James W. Davis became the owner of an undivided one-sixth interest and an undivided one-fourth interest in said land, or a total of ten twenty-fourths interest therein.

"The defendants state that by virtue of the foregoing sales these three defendants, on the first day of June, 1896, were the owners of interests in said land, as follows: The said James W. Davis of ten twenty-fourths interest therein, the said Tyson S. Dines of seven twenty-fourths therein, the said Perry S. Rader of four twenty-fourths therein, the remaining three twenty-fourths being owned by W. A. Snell.

"These defendants further state that upon the said last named date, in pursuance of the foregoing sales and contracts, they and their cotenant, W. A. Snell, went

into actual, open, notorious, peaceable and adverse possession of said tract of land, by and with the act and consent of said Samuel Balch, of which fact the plaintiff herein had actual notice and knowledge, and these defendants and their cotenant, W. A. Snell, have ever since been and are now in such possession of said land.

"These defendants further state that at the time plaintiff received his conveyance from Samuel Balch, he had actual notice and knowledge of such possession by these defendants and their cotenant, W. A. Snell, and that he was then and there informed that these defendants and their cotenant, W. A. Snell, were the owners of said land, and in actual possession thereof.

"Wherefore, these defendants pray for a decree of this court, declaring said deed from Balch to plaintiff to be void and of no effect as to the land in controversy; that the same be canceled, and that all interest in said land which plaintiff may have received thereby be vested in these defendants in their respective proportionate interests, and that these defendants be decreed to be the owners of respective interests in said land as follows: The said James W. Davis of ten twenty-fourths interest therein, the said Tyson S. Dines of seven twenty-fourths interest therein, and the said Perry S. Rader of four twenty-fourths interest therein, and for such other and further relief as may to the court appear just and equitable."

Plaintiff replied as follows:

"Now comes the plaintiff, and for reply to the defendants' amended answer denies each and every allegation of new matter therein contained, except that plaintiff has a deed to said land from Samuel Balch taken in settlement of litigation and other valuable considerations.

"Further answering, plaintiff states that the contract between Samuel Balch and defendants, which is alleged to have been made, and all other contracts referred to in defendants' answer, if made, were of and

concerning real estate, and that such alleged contract was not in writing signed by the parties thereto, and is void as being within the statute of frauds, and having fully answered plaintiff renews his prayer for judgment as asked in his petition.''

The court made the following finding of facts, and rendered the following judgment and decree:

''Come now the parties in person and by their attorneys and this cause being submitted to the court upon the pleadings and the evidence adduced, and the same having been duly considered by the court, the court doth find the issues for the defendants and that they are lawfully entitled to the possession of an undivided seven-eighths interest in the premises hereinafter described and that the plaintiff is entitled to the possession of the remaining undivided one-eighth interest therein, to which defendants by their pleadings have made a disclaimer.

''The court doth further find that a certain deed from Samuel Balch to the plaintiff herein, dated March 23, 1899, recorded in the office of the recorder of deeds for Carroll county, Missouri, in book 138, at page 189, and purporting to convey to plaintiff the interest of said Samuel Balch in and to said land, was taken and received by plaintiff with actual notice and knowledge, then and there had by plaintiff, that defendants, Perry S. Rader, Tyson S. Dines and James W. Davis, were then and there in the actual, open, notorious, peaceable and adverse possession of said land. The court further finds that said defendants were lawfully in such possession thereof by reason of having previously purchased from said Samuel Balch an undivided seven-eights interest in said land.

''Wherefore, it is by the court considered and adjudged that plaintiff have and recover an undivided one-eighth interest in and to the real estate described in plaintiff's petition, to-wit:  The southeast quarter of section fifteen, township fifty-three, range twenty, in

Carroll county, Missouri, as the same would be described if the United States Government survey north of the Missouri river be extended over said land.

"And it is further considered, adjudged and decreed that the defendants, Perry S. Rader, Tyson S. Dines and James W. Davis are entitled to have and to hold the remaining undivided seven-eighths interest therein.

"And it is by the court further considered, adjudged and decreed that the aforesaid deed from Samuel Balch to plaintiff herein dated March 23, 1899, and recorded in the recorder's office of Carroll county, Missouri, in book 138, at page 189, is in fraud of the rights of said defendants, Perry S. Rader, Tyson S. Dines and James W. Davis, and that the same, in so far as it affects the interests of said defendants by purporting to convey to plaintiff the interest of Samuel Balch in said land, be set aside, canceled and for naught held and that all interest which plaintiff herein may have secured in and to said land by reason of said deed be divested from plaintiff and vested in said defendants in proportion to the respective interests by them claimed.

"It is by the court further adjudged that plaintiff pay all the costs accrued in this cause."

After unavailing motion for a new trial plaintiff brings the case to this court by appeal for review.

Plaintiff's evidence tended to show that on the tenth day of January, 1840, lots one, two and three of section seven, township fifty-three and fractional section six, township fifty-three, south of the Missouri river, of range twenty, was patented by the government of the United States to James Keyte. That in 1852 the land was partitioned in the circuit court of Saline county, in which it was then situate, between the four heirs of said Keyte, and commissioners appointed to divide the land between them. In 1854, the commissioners made their report, dividing the land between the heirs, dividing it into four tracts, numbering them one, two, three and

four, and set apart lot numbered one to E. B. Keyte, lot number two to J. A. Keyte, lot number three to T. H. Spencer, and lot number four to J. T. Keyte.

The report does not seem to have been approved by the court, and for this reason the defendants objected to the introduction of the same in evidence, but the objection was overruled.

Plaintiff introduced deeds from the Keyte heirs, the parties to said partition suit, showing that they recognized said partition proceedings. One of these deeds was from Edward B. Keyte to Mary J. Keyte, conveying lot No. 1 set apart for him as shown by the commissioners' report; another was a deed from T. H. Spencer and wife, for a part of lot three set apart to them by the commissioners, and in said deed the commissioners' report was referred to in the description of the land. Another was a deed from Joseph T. Keyte to Mary J. Keyte conveying lot number four set apart to him by the commissioners. Mary J. Keyte and husband, John A. Keyte, in 1869 conveyed lots one and two in section six and seven in township fifty-three, range twenty, together with all accretions, to Willis H. Plunkett and William C. Applegate, and from there the plaintiff showed paper title to himself by mesne conveyances of the above-described land. Plaintiff, also, by deed from W. A. Snell to Charles Myers and by Charles Myers to plaintiff acquired the one-eighth interest that Snell claimed in and to said land.

Plaintiff also introduced a deed made by Samuel Balch of date March 23, 1899, conveying to him the land in question with other lands.

In identifying the land it was shown that the land described in the patent to James Keyte and the land described in the plat filed by the commissioners in the partition proceedings was a tract of land attached to Saline county, extending in a northerly direction, around which the Missouri river ran, practically making it a peninsula with its base attached to Saline county.

The oral testimony showed that the Missouri river in running around the point of this body of land caused a large sand bar to gradually attach to the same on the north and northeastern part thereof, and at the same time the river kept cutting in on the base of this strip until in about 1877 the Missouri river cut through the base thereof, cutting out a large portion of this strip, and in the course of two or three years the main channel of the Missouri river ran between this strip or what remained of it, and Saline county, and has ever since been so running.

The evidence upon the part of the plaintiff tended to show that a small part of this original strip of land which formed said peninsula and the accretions thereto never was washed away. It also tended to show that Grand river before the cutting through the base of this strip of ground emptied into the Missouri river one half or three quarters of a mile northwest of the northern point of this strip of ground.

This strip of land extending north from Saline county was known as Saline or Patrick's Point. After the Missouri river cut through the base or lower part of Saline Point the Grand river began extending in a southerly course and the action of the Missouri river and Grand river caused the formation of sand bars, north and west of the northern portion of this Saline Piont or body of land; that is, sand bars would be formed by the action of the Grand and Missouri rivers and the current would run so boats could pass between them until these separate bars were joined together at their head or at points against which the current ran, and then the current would drop below the bar thus connected until another bar was formed below, and the current of the Missouri river would again run between the bar formed aboye and the bar below, where boats would pass until these bars were filled up at the head as above stated. In this way the current of the Missouri river ran around north of the remaining portion

of Saline Point and also through the channel made by the cutting through the base of Saline Point until the old channel north and west of the northernmost point of Saline Point was filled up and connected to Carroll county on the west and to the Grand river on the north and east. This body of land so formed amounted to several thousand acres.

Owing to the difference between the United States survey north and south of the Missouri river, the land described in the deeds to plaintiff as part of lots one, two and three of section seven, and fractional section six, township fifty-three, range twenty, south of the Missouri river survey, would be section fifteen, township fifty-three, range twenty, north of Missouri river survey. The land described in plaintiff's deeds as being lots one and two in the partition survey would be embraced in the southeast quarter of section fifteen, fifty-three, twenty, north of the Missouri river survey. The testimony also shows that one Samuel Balch on the first day of April, 1882, purchased from W. Z. Darr the northeast quarter of the northwest quarter of section nine, and the east half of fractional section nine south of Grand river, and the east half of section sixteen, together with all the made land thereto belonging, all in township fifty-three of range twenty, and that he ran a fence from the Grand river to the Missouri river, and by reason of such ownership he claimed all of this formation of land, extending three or four miles along the Grand river and lying between the Missouri and Grand rivers. It was also shown that Myers and Balch had had considerable litigation in regard to portions of this land, and in 1899 Balch and Myers made a settlement of their litigation and Myers conveyed by quitclaim deed certain lands to Balch and Balch conveyed certain lands to Myers. Myers also paid about $700 costs under such settlement and paid Balch about $350 in addition to the land conveyed.

Other facts will be hereafter stated in the course of this opinion.

The court properly treated the case as one in equity, so it will be treated upon this appeal. Martin v. Turnbaugh, 153 Mo. 172, was an action of ejectment. The answer of one of the defendants was a general denial, and an equitable defense and cross-bill. MARSHALL, J., in speaking for the court, said: "The court properly treated the case as one in equity, for the defendant's answer and cross-bill was not only an equitable defense, but it sought affirmative relief which a court of equity alone had power to give." [See, also, Swon v. Stevens, 143 Mo. 384; Lewis v. Rhodes, 150 Mo. 498; Dunn v. McCoy, 150 Mo. 548; Lincoln Trust Co. v. Nathan, 175 Mo. 32.]

It is said for plaintiff that the body of land to which he showed title was not all washed away by the Missouri river, there being a small portion of the original land left to which a large amount of land accreted before the river cut away the greater part of Saline Point. Then the action of the river by accretion reformed against the part so left, and hence plaintiff is entitled to recover at least the original amount of land embraced in his deeds.

As to whether or not all of the original Saline county land was washed away, or any portion of the original land left, the evidence conflicts.

Samuel Carter, plaintiff's witness, testified that at the time he made the survey in 1887 (or 1888) "the point was gone; it was all made land;" and that "I found no original land when I surveyed it;" "I found nothing to indicate any old trees on the southeast of fifteen, I saw nothing but willows, some of them old enough to begin to die, but they were not old;" "I saw nothing that indicated the Saline high land;" "the original high land with the big trees on it was certainly all gone."

G. D. Kennedy testified for defendants that the

river "cut off all the Saline county point, clean, every foot of it;" "it cut off all the Saline county point;" "it cut it all off;" "it cut off all that part of the Saline county land where the bar lies now."

G. D. Kennedy testified for defendants: "I know where the Keyte land was located; I know where John Keyte had a wood yard over there; that land washed away; all of it; the whole of it." According to the commissioners' report lot two was set off to John Keyte. The northeast corner of the land in controversy is a mile and a quarter due south of the Grand river ferry, which is on the section line between sections ten and eleven, fourteen and fifteen. Kennedy continued: "I should think that land beginning a mile and a quarter south of the Grand river ferry and extending one-half mile further south, lying west of that line running due south from the ferry, at the old Saline point before the formation began; I suppose Saline point would be about in that locality. The Keyte land was right at the point; I mean the north point of Saline; all the land in that vicinity washed away."

Garrett Dye testified for plaintiff that the one-half acre that he observed there to be black soil in 1888 "was east and a little below the Keyte land; it was nearly down north of the Saline county point." "About 1888 I noticed that black soil—the sandy soil being above it attracted my attention—that seemed to be the original black soil, and it had been filled over about two feet, a kind of sandy loam;" "I think this piece of land that I speak of was something over a mile from the southeast quarter of section fifteen, the Charley Myers tract; it is east and may be a little bit northeast from the Charley Myers tract; it was pretty close to where Grand river now runs; between the piece of land I speak of and the Charley Myers tract John Myers owns a tract of land; there are some parts of the Loblolly between the Charley Myers piece of land and the land where this one-half acre is, and it looks like there had

been water there." "There was about one-half acre there in 1888 which I thought was old land; there was I presume sand over it eight to ten feet deep."

Boyd Watkins testified for plaintiff: "It was a peninsula before it cut in two, with a little piece of land in there that never washed away;" "I think the water was over it when it cut through; I think there were one or two saplings as large as my arm, and there was a stump that stood there that I noticed; the stump was a good-sized stump, may have been two feet thick, and it looked as if there had been a tremendous current going pretty much over the whole thing. When the river cut through it left a small portion of the main land, which might have been two or three acres. This little piece of land that I saw was a little over a mile, may be a mile and a quarter, from Brunswick, and extended down on the tract of John Myers, and I think his house is about on that point." "The bar was made up against it, just a gradual slope from the main land to the river's edge." "I know that the land that Mr. Myers owns is just below where Saline Point was. And the Schuchmann land is just below it, southeast of it. I know where Mr. Young's land is, or where the house stands on this land. I think the Saline Point where I saw those trees and stumps was right there, was about at that place." "I do not know where the Charley Myers piece of land is. I do not know whether there is any connection between the Charley Myers piece of land and this little narrow strip that did not wash away. I could go over there and find this piece of land now; I think it is where Mr. Myers' house stands. There is a low place there between the house and the land south of it. There is a low place between where Mr. Myers' house is on the northeast of fifteen and this one hundred and sixty acres; there is a low place south of there running out at what they call the Loblolly; it was the bed of the Missouri river; there is a long, low swale running east and west, running out towards Grand river, that they

call Loblolly lake; the land was right at or near John Myers' house; it extended north about one-half mile; at the time I was there and saw this old ground, the two or three acres that I spoke of, there was not a foot of land but what the river had occupied at some time."

William Carson testified for plaintiff: "The river cut through in 1877, and there was so much debris and wreck heaps that there was probably four or five acres of the original land belonging to Saline Point left on the north side; the river cut through on both sides; it had a big high bank on each side and the river had to cut on both sides to get a channel." "The strip of land was a little southwest of Brunswick, a little west; it was about one-half mile from the Chariton shore; I do not know where it is in reference to the Charley Myers land; there were no stumps on it; the water got up all over the land; nobody ever asked me to show him the three or four acres that did not wash away."

William Mortenmeyer testified for plaintiff: "I never was on the original land after it cut through in 1877. After it cut through I went over the river, and it appeared to me that I could see stumps there on the ground the river had left on the north of where the river cut through. I think there were two or three acres of the original land left, and probably several hundred acres of the bar; a portion of the bar had formed on the Saline Point that never washed away; it was a mile and a quarter or two miles and a quarter due south of Brunswick; I can locate that land; I have never been asked to do so. I can not say how much of the original Saline county land was left. I do not know what effect the high water of 1881 and 1882 had on the land."

William Pilatz testified for plaintiff: "The water got high and cut into the point; one night it broke, and the next evening the whole thing was in the water; and after the water settled down then the island came out and there was some little trees there on it, and on the

high land there was some willows. The boats went down along the island for two years. The point was cut through entirely; the river cut though in 1877; I was over there on the island two or three years afterwards, and saw a few stumps and a few willows. I testified at Keytesville that the only tree that I saw over there was a little sycamore, and that there was only one half acre. The five or six acres were about one mile and one half southwest of Brunswick; I do not know where the Charley Myers tract of land is or the John Myers land. The river is away south of these five acres, a mile or a mile and a half."

James Nichols testified for plaintiff: "When the high water came in 1877 the old original land, as well as the bar, was covered up; after the water went down I went across Grand river, and we came across this little island; it was standing there alone with a few stumps on it, and I noticed one tree in particular, a nice, broad mulberry, which would have made about four post to the cut; the tree was green. I know where John Myers house is now on the bar; I think the house stands right on the litle island we left there." "The water of the Missouri river ran all around it; it was on this island; I did not pay much attention to the old land; but I judged from the appearance of it that there was something like two acres. It might have all been washed away; I think it was about one mile and one-half from Brunswick, south or a little west of south."

This testimony of plaintiff's witnesses does not show that the land in controversy was an accretion to land which formerly was a part of lots one and two in section six and seven. Nor does it show that the small piece of land which witnesses say was not washed away was on either of those lots or the land in controversy. Not one locates it on what was originally the Keyte land.

Dye says "it was east and a little below the Keyte land." He says that the half acre of black soil which he

saw in 1888 and which was covered over the top with sand eight or ten feet deep, "was over a mile from the southeast quarter of section fifteen called the Charley Myers one hundred and sixty," which is the land in controversy, and that "it was pretty close to where Grand river now runs," which is a mile east of the land in suit. He also says that there are "parts of the Loblolly between the half acre" that he saw, and "the Charley Myers piece of land," and Watkins testifies that the Loblolly was formerly "the bed of the Missouri river," and that it is yet called "Loblolly lake," and that this low swale "running out towards Grand river," ran "between John Myers' house" on the northeast of fifteen and the land in suit. He further says that the house of John Myers is on this "little piece of land" that he saw, and that "it was a mile or a mile and a quarter from Brunswick," and that "I do not know where the Charley Myers tract is; I do not know whether there is any connection between the Charles Myers piece of land and this little narrow strip." Surely in the face of the testimony of those two men, plaintiff's own witnesses, no court could hold that plaintiff had shown that this land was accretion to the little piece of original land which they think had never washed away.

Carson testified that the four or five acres he saw were about one-half mile southwest from the Chariton shore. Mortenmeyer testified that it was a mile and one quarter or two miles and a quarter due south from Brunswick. Pilatz said that the five or six acres which he saw two years after the river went down in 1877 was about one and one-half miles southwest of Brunswick. Nichols says that the little island which he saw in 1877 which "might have all been washed away," was "one and one-half miles south or little west of south" of Brunswick, and that John Myers' house, which stands on the northeast of section fifteen, "stands right on the little island which I left there." Carson said he did

not know where the four or five acres that were all covered over with "debris and wreck heap" were "in reference to the Charley Myers land." He, Mortenmeyer, and Watkins said they could locate the small tract of original land, but had not been asked to do so, yet Carson testifies that John Myers had "pretty near raised him," and that he "had lived there for fourteen years."

That the evidence with respect to whether or not all of the original land was washed away in 1887 or 1888 or prior thereto is in conflict is indisputable, but the trial court in effect found that it was washed away before that time. And while this court will defer somewhat to that finding it is not bound thereby but will review the evidence and render such judgment as it warrants (Blount v. Spratt, 113 Mo. 48; Lins v. Lenhardt, 127 Mo. 271; Warren v. Ritchie, 128 Mo. 311; Dunn v. McCoy, 150 Mo. 548; Hoeller v. Haffner, 155 Mo. 589) and, our conclusion is that it preponderates in favor of the finding of the trial court.

When Balch purchased the land from Darr in 1882 he enclosed it and other lands with a substantial fence, and took actual possession thereof, and so remained in possession until the defendants and W. A. Snell went into possession of the land involved in this litigation, the defendants under a written contract for seven-eighths thereof between themselves and Balch dated October 31, 1895, and Snell under a deed from Balch dated in.1894 for the other eighth. Balch and defendants who claim title under him had been in the actual, continuous, open, notorious, adverse and hostile possession of the land in question for more than ten years before the institution of this suit, and the absolute owner of the land by the statute of limitations, and entitled to its possession as against plaintiff, unless he purchased it from Balch in good faith and without notice of defendant's contract with Balch for seven-

eighths of the land.   Upon this theory of the case the evidence shows that they rented such land to tenants in 1896 for a part of the crop, and that those tenants cultivated the land and delivered to defendants their share of the crop; that in 1897, Snell cultivated the land in corn, paying these defendants $200 rent for their portion of the land; that in the fall of 1897 Snell put a part of the land in wheat, and harvested it in the summer of 1898, and that summer Alex. Myers put the rest of it in corn, both paying rent to these defendants; that in the spring of 1899, Schuchmann put the land in corn and had remained there since up to the time of the trial, as the tenant of these defendants.   Balch says that he never after he made the written contract with these defendants owned any interest in the land or claimed any, or attempted to exercise any possession over it.   The evidence of Balch, Dye, Watkins and John Myers himself clearly establishes the fact that John Myers, this plaintiff, had for years been in possession of section eleven except ten acres down next to the ferry near Brunswick, and of the northeast quarter of section fifteen, which lies just north of the land in suit, and of section fourteen which lies east of it, and that Schuchmann had for years lived on section twenty-two, which lies just south of it; as early as 1890 he had obtained a deed from Louis Bosse, but made no inquiry of Alex. Myers or of Schuchmann or of any of these defendants, as to who owned this land.   He first instituted a suit against Snell in the summer of 1899 in the name of Charles Myers, as plaintiff.   At that time he had the deed from Balch for this land, dated March 23, 1899. Snell sold out to him on June 12, 1899, and then at the next term of court the suit was dismissed, and this plaintiff paid the costs.   He says in his testimony that he acted for Charles in employing Benecke to bring that suit.   He says that he had been connected with the litigation that had been going on over this and other land on the bar for ten years, and knew that these de-

fendants were the attorneys. for Balch in those suits, two of which had been brought against him for the land in the northeast quarter of section fifteen, the land adjoining this in suit, and in settlement of which he obtained the deed of March 31, 1899; but he neither asked Balch's attorneys who was the owner of this land, nor wrote to him or them, or had his attorney do so.

But it is stated by plaintiff's counsel in his statement that "Myers, before he concluded the matter of obtaining a deed from Balch," asked Snell, who was in possession of the land in question, as to its ownerships and was informed by Snell that he, Snell, owned one-eighth, and Balch the balance of such land.

So much of that statement as asserts that Myers made inquiry "before" he obtained the deed from Balch is refuted by Myers' own testimony, and the balance of it (that Snell was in possession at that time) has no evidence on which it can be based. Plaintiff testified that Snell told him he owned one-eighth of that land and Sam Balch owned seven-eighths, but he also says that Snell told him that when he was making his deed to his one-eighth interest to Charley Myers. That deed was dated June 12, 1899, and the deed from Balch to plaintiff was dated March 23, 1899—nearly three months before Snell told him this. He further says that that was the first time he heard Snell say that Balch owned seven-eighths interest in this land, and that he "never went to Snell before he got that deed" from Balch "and inquired what his interest in that land was," but that Snell told him that when he was making "the deed from Snell to me." So whether Snell was in possession or not when he made that statement to Myers, if he ever did so, is of no importance, because by plaintiff's own testimony the statement was not made for nearly three months after he had obtained his deed from Balch.

But there is no evidence that Snell was in possession when plaintiff obtained his deed from Balch. The

evidence of Mr. Davis and Mr. Schuchmann makes it clear that in the summer of 1898 Snell for himself and as the tenant of these defendants had a crop of wheat on a part of the land, and that the rest was rented to Alex. Myers, who raised a crop of corn on it. From that time on Snell is not shown to be on the land at all—or near it. For the year 1899 the land was rented to Schuchmann, and Schuchmann put that part, on which Snell had the previous year raised wheat, into corn. The evidence does not show where Snell was in the spring of 1899. Myers said that Snell "seemed to be in possession" at the time he got the deed from Balch, on March 23, 1899.

It is impossible with these facts before us to come to any other conclusion than that Snell was not in possession at that time of the seven-eighths interest of these defendants, or, that the deed from Balch to plaintiff, in so far as the title to the land in question is concerned, was not taken by plaintiff with actual notice and knowledge that defendants were at that time in the actual, open, and notorious possession of said land. Upon the other hand, the evidence we think conclusively shows that plaintiff did have, at the time of his purchase from Balch, actual notice of defendants' interest in the land, and was not therefore an innocent purchaser.

There is no question with respect to plaintiff's one-eighth interest in the land acquired by him by deed from Snell.

The conclusion reached renders it unnecessary to pass upon the Keyte title to the land which plaintiff claims to have acquired by mesne conveyances, for there could have been no title acquired to land which we hold did not exist. Moreover, the evidence clearly shows that the original land which Dye and others seem to have discovered was not on what was originally the Keyte land.

For these intimations the judgment should be affirmed. It is so ordered. All concur.