## LINS et al., v. LENHARDT et al., Appellants.

### Division Two, March 5, 1895.

1. **Appellate Practice:** EQUITY CASE: TRIAL DE NOVO. When an equity case is appealed to the supreme court, it is for hearing *de novo* and it will be considered, for the most part, as if it had originated there and was to be heard for the first time. The appellate court will not, however, appoint a commissioner, in such case, to take an account, as such action would amount to an assumption of original jurisdiction.

2. ——: ——. The supreme court will, on appeal in equity cases, defer, to a considerable extent, to the result on the facts reached by the lower court, where the testimony is delivered orally and does not appear in the form of depositions.

3. **Disposition of Property:** UNDUE INFLUENCE: FRAUD: BURDEN OF PROOF. Where a disposition of property is made which is virtually testamentary in its character and clearly unreasonable, to the extent of enriching one or two members of the donor's family and impoverishing others, and there is evidence *aliunde* of undue influence or fraud, the burden of proving the absence of undue influence or fraud is upon the beneficiaries in such disposition.

4. **Husband and Wife:** GIFT TO WIFE: EVIDENCE OF REASONABLE ALLOWANCE TO WIFE. Where transactions between a husband and wife amount to a mere gift to the wife, a court of equity will require clear and incontrovertible evidence to establish such gift as a matter of intention and fact and that the gift, allowance or settlement be no more than a reasonable provision for the wife, and evidence is admissible, in such case, to show what is a reasonable allowance for the support of one in the wife's condition in life.

5. ——: PURCHASE BY HUSBAND: DEED TO WIFE: FRAUD: UNDUE INFLUENCE. Where a husband intended to have deeds to property purchased by him made to himself, but his intention was frustrated by the contrivances and fraud of his wife and the deeds made to her, a court of equity will set them aside at the instance and in favor of the heirs.

5. ——: PURCHASE OF PROPERTY BY WIFE: PRESUMPTION OF PAYMENT. In the absence of any satisfactory showing that the wife purchased property with her own separate funds, the presumption is a strong one that the husband furnished the means of payment.

| 127 | 271 |
| 133 | 37 |
| 127 | 271 |
| 69a | 590 |
| 127 | 271 |
| 144 | 481 |
| 127 | 271 |
| 79a | 640 |
| 127 | 271 |
| 81a | 6 |
| 127 | 271 |
| 158 | 646 |
| 127 | 271 |
| 165 | 375 |
| 166 | 634 |
| 127 | 271 |
| 168 | $^2$572 |
| 92a | $^1$357 |
| 127 | 271 |
| 170 | $^1$708 |
| 172 | $^1$287 |
| 173 | $^1$558 |
| 100a | $^6$722 |
| 127 | 271 |
| 177 | $^2$422 |

6. ———: DEATH OF HUSBAND: TESTIMONY OF WIFE AS TO TRANSACTIONS. BETWEEN THEM. Where transactions between the husband and wife constitute the "contract or cause of action in issue and on trial" to which the wife is a party, the husband being dead, she is incompetent to testify in her own favor as to such transactions.

*Appeal from Buchanan Circuit Court.*—HON. H. M. RAMEY, Judge.

AFFIRMED.

Equitable proceeding instituted at the September term, 1888, by Charles Lins and wife against Theresa Lenhardt, the widow of John Lenhardt, who died March 1, 1888, a little over seventy years old. Mrs. Lins or "Katy" is one of the children of John Lenhardt by his first marriage. Maggie, Marie, Josie and Frank are children of John and Theresa by a second marriage. The children of the second marriage, as well as the widow, were made parties defendant. The object of the petition is to have Theresa and Maggie declared trustees of certain real estate to the extent of Katie's interest therein, as one of the heirs of John, her father.

As bases for this relief, the petition charges that John was of unsound mind, feeble in health, and descrepit with age, was induced by the fraudulent practices and dominant and undue influence of his wife, Theresa, to transfer to her, on or about June 25, 1887, some $16,000, received by him as the cash proceeds of the sale of certain land in St. Joseph to a railway corporation, and deposited by him in the State Savings Bank, in that city; that, on August 8, next thereafter, by similar means, Theresa induced John to transfer to her $4,000, the residue of the proceeds of the sale of the land, deposited as aforesaid; that Theresa drew the funds thus deposited from the bank, and has secreted the greater part thereof; that Theresa,

by means of undue influence, induced John to purchase
certain parcels of real estate in the city of St. Joseph,
which were paid for out of the money of John; that
Theresa covinously procured the deeds for such parcels
of land to be made to her, and fraudulently put them
to record December 1, 1887, contrary to the express
requests of John to the agent in that behalf; that, on
the twenty-sixth day of June, 1887, John then owning
one half of lot 11 in block 33, in Patee's addition to
the city of St. Joseph, being weak in body and mind
as aforesaid, was induced, deceived and defrauded by
Theresa to convey said half lot to "Maggie," her
daughter, and that was done, as were the funds in bank
procured to be transferred as aforesaid, by impressing
on the mind of John the baseless belief that he was
about to be sued by some persons who made some
claim against him, would be involved in litigation,
judgments rendered against him, and his property taken
to satisfy the same, unless conveyed beyond the reach
of execution process; that, induced by these fraudu-
lent and deceptive representations, being unable to
resist the dominating influence of his wife in his then
feeble condition, John made transfer of that lot and of
other funds in bank; that "Maggie" conspired with
her mother in all the fraudulent purposes and practices
aforesaid, and holds title to said lot for the uses and
purposes of her mother; that Theresa had no property
when married to John and never acquired any by
descent or purchase; that John had an estate and
added largely thereto by industry and enterprise; that
in order to further her design to obtain John's prop-
erty, Theresa abandoned him, and instituted suits
against him for divorce and alimony, and he, in order
to avoid scandal and litigation, transferred to her, by
way of compromise and adjustment, certain portions

of his property; that, by such means, she obtained and still retains large portions of his estate not theretofore mentioned in the petition; that John always desired that plaintiff "Katy" should share equally with his other heirs in whatever estate he should die seized and possessed of; that Theresa endeavored so far as in her lay, to thwart John's wishes in this regard, etc.; that all the property described in the petition was in equity and good conscience the property of John at the time of his death, etc. The petition concludes with a prayer for appropriate relief.

This petition was an amended one, and was filed February 22, 1892, after the hearing, which began November 6, 1891, the cause having been continued for future argument, which occurred March 4, 1892. Defendants objected and excepted to the filing of the amended petition, but, their objection being overruled, filed a general denial and never saved the point in their motion for a new trial.

After hearing argument the court entered the following decree:

"This cause having been heretofore submitted to the court upon the pleadings and evidence of the parties, and argued by the counsel, and by the court taken under advisement, and the court being now well advised what judgment should be entered in the case, doth now order that plaintiffs may amend their petition to conform to the proofs in the case, and thereupon the plaintiffs file amended petition in conformity to such order, and the defendants file answer thereto and plaintiffs file replication, and thereupon, upon consideration of the pleadings so made, and the proofs made as aforesaid, the court doth find the allegation of the plaintiffs' petition to be true and all issues herein for the plaintiffs and that they are entitled to the relief prayed in their petition.

"The court doth therefore order, adjudge and decree the transfer by the late John Lenhardt to defendant Theresa Lenhardt of the money and funds in bank, mentioned in the petition, was procured by the undue influence and fraud of the said Theresa exercised over and practiced upon the said John; that the said property described in the petition, except the lot conveyed to said defendant Margaret, was purchased with, and paid for out of said funds, so fraudulently procured from said John; and that said property was purchased by said John and intended to be conveyed to him; but by the machination and fraud of said Theresa the deeds therefor were procured to be made to her:

"That the deed made to the defendant Margaret, whereby the north half of lot 11, in block 33, in Patee's addition to the city of St. Joseph, Buchanan county, Missouri, was conveyed to said Margaret, was procured in the manner, by the means and for the purpose stated in the petition:

"That the said John Lenhardt left surviving him five children, to wit: Defendants Joseph, Frank, Mary, Margaret and plaintiff Katie, as his sole heirs at law; that the said Katie Lins is entitled to one fifth of said estate of said John Lenhardt.

"The court further finds and decrees that the funds in bank aforesaid, procured by said Theresa as aforesaid and all increase and investments thereof by said Theresa, were the property of said John Lenhardt at his death, and the pretended transfer thereof to said Theresa, and investments in her name were null and void as to said plaintiff, Katie Lins; that the said Theresa holds an undivided fifth part of said real estate, described in the petition, to wit: Lots 8 and 9 in block 54, lot 28 in block 71; lot 3 in block 20; lots 30 and 31 in block 44; lots 12 and 13 in block 72; lots 14 and 15 in block 30, all in St. Joseph Extension Addition to the city of

St. Joseph, Buchanan county, Missouri, in trust for the plaintiff Katie Lins, and the defendant Margaret, holds the undivided one fifth of the aforesaid north half of lot 11 in block 33, in Patee's addition aforesaid, in trust for said plaintiff Katie Lins, and that the plaintiff is entitled to an immediate conveyance of said several undivided interests to herself, subject to the dower interest of Theresa, as the widow of said John Lenhardt.

"It is therefore further considered by the court that all the right, title and interest of the defendant, Theresa Lenhardt of, in and to the undivided one fifth of the aforesaid real estate, to wit: Lots 8 and 9 in block 54, lot 28 in block 71, lot 3 in block 20, lots 30 and 31 in block 44, lots 12 and 13 in block 72, lots 14 and 15 in block 30, all in said St. Joseph Extension Addition to the city of St. Joseph, be and the same is hereby divested out of the said defendant, Theresa, and vested in the plaintiff Katie Lins and all the right, title and in interest of the defendant Margaret Lenhardt of, in and to the undivided one fifth part of the aforesaid north half of lot 11 in block 33 in Patee's addition to the city of St. Joseph aforesaid be, and the same is hereby divested out of said defendant and vested in said plaintiff, Katie Lins, to have and to hold unto the said Katie Lins all the undivided fifth of the proceeds aforesaid in fee, as though the said John Lenhardt had died seized in law thereof; and the said defendants and each and all of them are hereby enjoined and restrained from interfering with or encumbering or in anywise disturbing or injuring the right and title of the plaintiffs in said parcels of ground.

"And it is further ordered that the plaintiff Katie Lins be let into possession of said premises as tenant in common with the said Theresa in proportion of the respective titles aforesaid and that a writ of assistance,

if demanded, issue to place plaintiff in possession of the interest and estate herein decreed to her.

"It is further ordered that the defendants pay all costs herein accrued and not heretofore adjudged; that the plaintiffs recover of the defendants their costs herein expended and have thereof execution."

From this decree defendants have appealed to this court.

*James W. Boyd* for appellants.

(1) The decree is not sustained by the evidence. It is based on an erroneous view of the equity and evidence in the case and ought to be set aside. *First.* This court will review the whole case on the evidence. *Benne v. Schnecko*, 100 Mo. 250; *McElroy v. Maxwell*, 101 Mo. 294. *Second.* An examination of this case will show to this court that the decree is really against the evidence and the equity in the case. *Third.* The trial court held that it was its duty to consider and pass upon the question, as to whether the money given by John Lenhardt was a reasonable allowance "for this woman's support." This question was not pertinent to any issue in this case. It was error for the court to base its decree, in whole or in part, upon evidence on this question, which is an issue. The admission of evidence is error. John Lenhart had a right to give his wife more than a meager or scanty allowance. His kindness to her is not a badge of fraud. But, even if the sum he gave was, in the estimation of others, too much to give to an aged wife, still the giving of that sum is not evidence of fraud. *Maddox v. Maddox*, 114 Mo. 35; *Norton v. Paxton*, 110 Mo. 456. (2) The decree as against Margaret Lenhardt (now Parlow) is not sustained by any evidence whatever, and is unjust, illegal and inequitable, and of course should be set

aside.   Indeed, it is directly against the evidence.  (3) The court admitted improper and illegal evidence offered by plaintiff.   It was error on the part of the court to enter into an investigation of, and to hear evidence as to, what constituted a reasonable allowance by John Lenhardt, deceased, to his wife, Theresa Lenhardt.   The ruling of the court, that such testimony was material and relevant, is not only erroneous, but shows that the decree was based, at least in part, thereon.   If such evidence had been excluded the decree would probably have been in favor of defendants. (4)   The court admitted improper and illegal evidence in the case.   (5) The decree should have been in favor of the defendants Theresa Lenhardt and Margaret Lenhardt.   (6) The decree is erroneous, illegal, based upon illegal evidence, unjust, unfair, against the evidence, law and equity in the case, and should be set aside. (7) The decree is outside of the pleadings, and, of course, is not based thereon.   It decides matters which are irrelevant, not included in the allegations, and is erroneous.

*W. B. Thompson* also for appellants.

(1)   The deeds sought to be set aside, made to Theresa Lenhardt, are alleged to have been purchased with the money of John Lenhardt.   The allegation is not sustained in the following particulars:   *First.* Because there is no evidence to show that any money belonging to John Lenhardt was used for the purchase of any of the property.   *Second.* .Because the money that was used had been given to Theresa Lenhart prior to the execution of the deeds.   *Third.* Because the evidence showed that at the time of the execution of the deeds John Lenhardt had directed their execution in favor of his wife to all, except the two deeds made by

Maxwell, and that, as to those deeds he subsequently destroyed the deeds made to himself. *Fourth.* Because the court will not consider any ground for relief, except that which is alleged in the petition, and which is sustained by the proof. *Cox v. Esteb,* 68 Mo. 110; *Turner v. Turner,* 44 Mo. 535. (2) There is no evidence that the conveyances made to Theresa Lenhardt were paid for with the money of her husband, and, even if such fact did appear in the evidence, then such conveyance would be deemed an advancement to the wife, if made with his consent, and no resulting trust would arise in favor of the husband or his heirs. *Darrier v. Darrier,* 58 Mo. 222; *Gilliland v. Gilliland,* 96 Mo. 526; *Moore v. Moore,* 67 Mo. 196; 1 Perry on Trusts, sec. 143; 2 Story's Eq. Jur., sec. 1201. (3) There is no objection to the execution of a will by a person in feeble health, or suffering from weakness of body or disease; even a weak-minded person, if he is of sound mind, can make a valid will or a valid deed. Bigelow on Fraud, p. 281–377; *Smith v. Beatty,* 2 Ired. Eq., 456; *Ranken v. Patten,* 65 Mo. 378; *Street v. Gauss,* 62 Mo. 228; *Bradshaw v. Yeates,* 67 Mo. 221.

*Culver & Davis* and *Pike & Morton* for respondents.

(1) The plaintiff was not required to make precise proof that any of the money belonging to John Lenhardt was used in purchasing the land. It was sufficient to show that she had all of her husband's money in her hands and probably had none of her own; or, if any of her own, that it was mixed and confused with his. (2) It is claimed that the money paid was given by the husband to the wife prior to the execution of the deeds. This point is made upon the idea that the original petition did not permit the claim that the money was also fraudulently obtained. The amended

petition removed that question from the case.  (3.)  It is also argued that John Lenhardt directed the deeds to be made to his wife.  This may have been so; and yet it is not easy to see how the deduction can be made therefrom to have John's estate transferred to Theresa is made lawful.  His direction would be no more valid than his transfer of the fund, as one as much as the other is the product of Theresa's control over her imbecile husband.  (4) It is also said that the money used by Theresa will be considered an advancement to her; and hence no resulting trust can arise.  If he had not the capacity or freedom of will to make a valid gift or contract, he was incapable of making an advancement to or settlement upon his wife.  If he had not mind enough to make a gift, the alleged gift can not be retained by calling it an advancement.  (5)  The petition is grounded upon the theory that John Lenhardt was of unsound mind and incapable of making a disposition of his estate and that he was subject to the undue influence of his wife, the alleged donee.  The evidence shows a persistent purpose on her part to obtain all the property of her husband and to deprive the plaintiff of any part as his heir, and that she accomplished a transfer to herself of all his property by means of her control over him in his feeble condition and by other fraudulent means.

SHERWOOD, J.—Of course this cause is, to a large extent, a *fact case*, but still there are certain principles of law that are interwoven with the facts elicited in evidence.  It is claimed that the evidence is wholly insufficient to support the decree entered.  When an equity cause comes up to this court, it is for hearing *de novo*, and it will be considered, for the most part, as if it had originated here and was to be heard for the first time.  This, however, would not authorize this

court to appoint a commissioner to take an account, for this would be to exercise an original jurisdiction. *Knowles v. Mercer*, 16 Mo. 455.   But, nevertheless, practically, an equity cause is to be heard and determined here as if for the first time.   *Blount v. Spratt*, 113 Mo. 48; *McElroy v. Maxwell*, 101 Mo. 294; *Benne v. Schnecko*, 100 Mo. 250.

Notwithstanding this, we still adhere to the rulings in the cases cited, as well as in numerous others, that we will, to a considerable extent, where the testimony is delivered *orally*, and does not appear in the form of depositions (*Allen v. Logan*, 96 Mo. 591) defer to the result on the facts reached by the lower court.

The evidence in the record is very voluminous, and having read it, it will not be necessary to set it out in detail; it will be sufficient in the main to quote occasional portions of it, state the general tendency and effect of the material residue, and then give our conclusion on the whole case.

In the first place, it is shown by several witnesses, Pollard, C. Q. Lewis, and Stuppy, that John Lenhardt always spoke kindly of Katy, and earnestly desired and designed to give her her proper and equal share in his property, but his wife exhibited a decided repugnance to Katy being recognized in the distribution of his property. This is testified to by Katy and J. H. Lewis.   That Katy was to have her share of the property, is admitted, even by defendant in her testimony.   But it is shown that defendant would intercept letters written by Katy to her father, so that Katy had to write in care of Stuppy, so that her letters could reach their destination.

The result shows that John did not convey a share in his property to Katy.   What prevented his wish from being consummated?   The ties of natural affection are not easily sundered, and, therefore, when undue influence is charged such questions assume a peculiar

prominence. " 'Where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, * * * this, of itself, will impose upon those claiming under the instrument, the necessity of giving some reasonable explanation of the unnatural character of the will' " *Gay v. Gillilan*, 92 Mo. *loc. cit.* 264, and cases cited. The same reason should hold where a disposition of property is made which is virtually testamentary in its character, and which enriches one or two of the donor's family and beggars the others, that is to say, where the disposition of the property is clearly unreasonable, as aforesaid, and with that is coupled, by evidence *aliunde,* proof of undue influence or fraud, etc., then the burden would be shifted, all of which is explained in *McFadin v. Catron*, 120 Mo. *loc. cit.* 270.

It is established by Dr. Long, who had been in attendance on John Lenhardt as late as the latter part of September next preceding his death, and during that month eight or ten times, and for some five years prior to that period, that Lenhardt was afflicted with general breaking down of the nervous system, in a word paresis, *i. e.*, a wasting away of the brain tissue, without softening; that this had been his condition for some five years before the doctor's last visit; that Lenhardt gradually got feebler in body and feebler in mind; that his digestive system was disarranged, that those symptoms usually end in paralysis; that those symptoms increased in Lenhardt, he was usually lying down, less inclined to talk, his bowels would not move, urine had to be drawn off by artificial means; that these mental signs of weakness increased very much toward the last, he lost his energy and will power, was disabled from doing anything, disinclined to talk and did not do so to amount to anything, was feeble minded; that such persons frequently suffer from illusions; that when he last

saw Lenhardt he had no capacity to resist anything, and in his opinion at the time of his last visit Lenhardt was not of sound mind and had not been of sound mind for a year and a half or two years prior to that time. Dr. Long also states that Mrs. Lenhardt for years contended that her husband was insane; she frequently spoke in that general way, said her husband was a crazy man.

The doctor also says: "The last week I treated him, my opinion was very unfavorable. I told her how this thing would progress, and how it would end; then she told me: 'I have things just my own way; I have all the money deposited in my name; I collect the rents and go to his bed and ask him for the key which he has under his pillow, and I unlock his trunk and get the bank book, and have the money deposited in my name, and lock the trunk again, and as long as he has the key he is satisfied; he has not mind enough to know or look that I don't deposit the money in his name.'"

J. H. Lewis supports by his testimony that of Dr. Long, for he says that he did not regard Lenhardt, whom he had known and done business for for years, as of sound mind; that "he would tell me often that he would put so much money in an old bureau drawer that belonged in the house and when he would go back the amounts were not there, and he was disposed to think that his wife had a key to his drawer. His wife told me he was insane, and his wife told me if he had a proper mind about him he could have seen that she simply opened the drawer above and took it out, and she could get into the drawer below."

This witness also states that the relations between Lenhardt and his wife were exceedingly unpleasant; they never spoke pleasantly of each other, either she of him or he of her; that about six months before certain

deeds were executed as mentioned in the petition. John Lenhardt showed him a hack across the hand, made, as he said, by his wife with a butcher knife; that at the time the deeds were made, to wit, in 1887, John seemed to be alarmed, that he was trying to evade something; that he seemed to have the idea that he had to do something in order to save his property; that he said that his wife said that there "was a strong probability" that a suit would be brought against him; was afraid that suits would be brought and judgments recovered against him, although he could give no reason why; and that all his property would be taken to satisfy the judgments, though no suits were pending against him; that two deeds were drawn, each for the same piece of property, from the same grantor, one to the husband and the other to the wife; but that the husband and wife came, one at a time, to his office and gave separate directions as to whom the deed should be made; that the wife said "that John was involved, in some manner, and that a judgment would be rendered against him, and on that account it would be best to have the property in her name;" that John told witness "that that was his condition, and that it would probably be best to make the deeds in his wife's name—*that they had persuaded him.*"

This transaction occurred after the sale of John's property to the railroad, out of which he had realized some $18,200, and resulted in that deed in the name of his wife being put to record; this occurred as to two deeds of lots from different grantors.

W. H. Lewis, son of the former witness, who drew the four deeds, and whose memory seemed to be better on the point than his father's, says he drew four deeds, and after two of the deeds had been drawn in favor of John, Theresa came by herself and countermanded the order, and had the two deeds made to herself, and in a

week or ten days after the deeds were drawn took away all of the four deeds; that the first two deeds were drawn and acknowledged to John, under the instructions of both John and Theresa, and within a few days thereafter she came alone and countermanded the order, etc.

Pollard also testifies that at the time he acted with C. Q. Lewis in the purchase of John's property for the said road, and when John came to see about the checks arranged "he was very wild;" that at other times he seemed to be "at himself." At other times "he seemed not to be competent to transact business;" that is, he was not "a rational man."

The evidence also discloses that there were mutual disagreements, quarrels and fights between John and Theresa, John accusing her of collecting the rents and not making returns. At one time, it seems in 1877, a little over ten years before his death, she separated from him, on account of his mistreatment, and brought suit for a divorce, which John compromised with her by paying her $500.

When John came to Stuppy's office to make the deed to the half lot 11 to his daughter Maggie, property worth some $1,500, "he was," as Stuppy says, "in trouble; he was afraid he would be attached in some way or other, for debt, or for some mischief, and he thought he could turn that property over to his daughter, in order to hold it." It also appears in evidence that as to small sums, John's mind could grasp them, but not so as to large ones; with those he seemed to feel embarrassed—this is shown by Pollard's testimony that when he received the large check of $18,200 arising from the sale of the property to the railroad "he said he did not know hardly what to do with his money; he wanted to give Katie a part of that money; he did not know what to do with it."

On the eighteenth of June, 1887, John received a check for $18,200, as the proceeds of the sale of his land to the railroad, known as the Maple Leaf, which check he deposited in the State Savings Bank on the same day. On the twenty-fifth of that month he went to the bank with his wife, and had transferred to her $16,000 in four interest bearing certificates of deposit. On the twenty-second of that month he went to the bank again, drew out $2,200 and had it made into certificates of deposit for his wife. On the eighth day of August next thereafter, John deposited $3,950 in the State Savings Bank to the credit of his wife, she not being present. Notwithstanding these lavish gifts, John still had something left. We are not kindly furnished with the inventory of his estate, although it is referred to in the abstract as being introduced. It appears incidentally, however, that he left some $4,000 in notes, touching which sum his wife says with charming *naivete*, "*I could not get it; his name was on.*"

There is evidence to the contrary of the foregoing as to the mental condition of John, but it is not of such a preponderating character as to warrant our substituting our views for those of the circuit court. We are satisfied from the evidence, which well warranted the belief of that court, that John Lenhardt's mind was affected; that he was laboring under the illusion, consequent on a diseased condition of the brain and of his wife's cunning machinations, that his money and other property would be swept away from him by litigation coming from some quarter, he knew not where, and based on a cause, he knew not what, and that in order to save what he had he had to make it over to his wife or daughter, principally the former.

The fact that he was able to draw the undated contract for the building of a frame house for his wife, which was to be completed by October 1, 1887, he being

a carpenter, and the drawing of such a contract a mere perfunctory operation, argues nothing in favor of the general soundness of his intellect; besides, that contract may have been drawn when he "was at himself," as one of the witnesses expresses it.

Complaint is made that plaintiffs were permitted to show what was a reasonable allowance per annum for the support of one of Theresa's condition in life. There was no error in such evidence being admitted.

If the transactions between a husband and wife amount to a mere gift to the wife, a court of equity will require that clear and incontrovertible evidence be brought forward to establish such gift as a matter of intention and fact, and will also require that such gift or allowance or settlement be no more than a reasonable provision for the wife. 2 Story's Equity Jurisprudence [13 Ed.], sec. 1375; 1 Bishop on Law of Married Women, sec. 754; *Paschall v. Hall*, 5 Jones' Eq. 108. Frequently such gifts, etc., fail by reason of the mere "*extravagance* of the gift." *Elliott v. Elliott*, 1 Dev. and Bat. Eq., *loc. cit.*, .62.

In *Beard v. Beard*, 3 Atkyns, 72, a court of chancery refused to sanction a conveyance where the husband conveyed the *whole* of his estate to his wife, because it was not in the nature of a provision, "which is all the wife is entitled to."

In order to determine whether such gift or provision is reasonable, it is proper to consider the condition of the parties as to its reasonableness, and more especially as to whether, if the gift or settlement is to stand, there will be sufficient left for the heirs of the donor; for the heir at law is a favorite in all courts; the chancellor will never disinherit him in order to bestow an unreasonable allowance on the wife. *Wells v. Wells,* 35 Miss. 638, and cases cited.

And the question is important also in endeavoring to ascertain whether undue influence was not used in order to enrich the wife at the expense of the heirs. There are too many of the ear marks and indications of undue influence scattered through this record, to be lightly overlooked; too many signs that the will of the wife had become the will of the husband, and that he was a mere puppet in her hands, and in a state of vassalage to her, to admit of any serious doubt as to the correctness of the conclusion on this point reached by the lower court.

But, aside from any question of undue influence, if it be true, as found in the decree, and there is much evidence to support the finding, that John intended to have the deeds of the property made to himself, but his intention was frustrated by the contrivances and covin of Theresa, and the deeds made to her, then a court of equity will set aside these conveyances at the instance and in favor of the heirs. *Smith v. Smith*, 50 Mo. 262; 2 Bishop on Law of Mar. Wom., sec. 120.

Strenuous effort has been made to show that the property sold to the railroad was the property of Theresa, but the evidence, even her own, does not sustain this assertion. At first she repeatedly said that she kept the property, which was bought of Whitehead, *in her own name*, but, on being closely pressed with questions whether the property was not conveyed by Whitehead to John, she finally said, *"I don't know exactly."*

This property, she says, was bought in 1864, when they moved to St. Joseph. The couple were married in 1851, as she states, and that they only had $200 when they reached St. Joseph, having lost everything in the war. Then she says that, at the time of this purchase from Whitehead, she had $2,000, derived from the estate of her father; that she had had that

money on hand for fourteen years and with it she had paid for the property.     Taking it as true that she had $2,000, derived from her father's estate, for fourteen years, then she must have had it in 1850, which was one year before her marriage to John.     But, later on, she says she never heard of her father's death until 1859, and still later that she never received the money from his estate till 1877.     So that it is clear that if she did not have the $2,000 in 1864, then it did not go into the property afterward sold to the railroad.     If, on the other hand, she did have that money in 1864, then, under the law as it then existed, that money belonged to her husband *jure mariti*, unimpressed with any trust in his hands, when invested in lands.     *Woodford v. Stephens*, 51 Mo. 443; *Modrell v. Riddle*, 82 Mo. *loc. cit.* 36.     And the rule applies to the earnings of a married woman; during the period mentioned, they were the property of the husband.     1 Bishop on Law of Mar. Wom., secs. 212–215.

In the absence of any satisfactory showing that the wife purchased property with her own separate funds, the presumption is *a violent one* that the husband furnished the means of payment.     *Seitz v. Mitchell*, 94 U. S. 580.     Now, in this case, if Theresa invested the $2,000 in property in 1864, she certainly did not have it in bank June 25, 1887, as she says she did, and it is not pretended that she had any separate estate, from whence that sum could be derived.     If, in 1877, as she says, she "signed over" the property to her husband upon making up with him after a separation, then this may be regarded as a recognition of his original right to it.     But it is unnecessary to pursue her testimony further.     Filled as it is with numerous contradictions, the lower court doubtless disregarded it.

There is another view, however, to be taken of her testimony; it is this:     The transactions between her

husband and herself amounted to the "contract or cause of action in issue and on trial" in this case, and he being dead, and she being "the other party" to that "contract or cause of action," was incompetent "to testify in her own favor" as to transactions between them. *Meier v. Thieman,* 90 Mo. 433, and cases cited; *Berry v. Hartzell,* 91 Mo. 132. This point was not raised in the court below, and, therefore, it is not necessary to discuss it. We only mention it, lest it be thought that, by passing over it in silence, we have given our sanction to such evidence as admissible. This, however, we do not do.

Finding no error in the record, we affirm the decree. All concur.