ROBERT H. CRUMP, Appellant, v. EMMA W. WALKUP et al.

Division One, November 30, 1912.

1. **HUSBAND AND WIFE: Purchase of Property: Presumption that Money Belonged to Husband.** The presumption that land purchased during coverture and deeded to the wife was paid for by the husband, originated under the common law governing marital relations, which gave to the husband all of the wife's personal property and the issues, profits and rents of her real estate, and denied her the right to contract for the purchase of other property. But the condition which gave birth to that presumption was abrogated by our Married Woman's Act (Secs. 8304 and 8309, R. S. 1909), which gives to the wife the power to contract, acquire personal and real estate, engage in business in her own name, and sue and be sued, and provides that all such property, and all property acquired by her separate labor or business, together with all increase and profits thereof, are her separate property, and not liable for her husband's debts.

2. **————: ————: ————: Overcome by Evidence: Fraudulent Conveyance.** Such presumption is overcome by evidence showing that the husband was himself insolvent, both before and after the purchase of the land deeded to her, and that all the money either had was derived from the natural increase of pigs and poultry given her by a relative, which she used to support

the family, and from the sale of cordwood cut from a piece of land which she bought on time, and sold at such a price as to pay for the chopping and hauling and for the other lands bought by her. Such land cannot be taken to satisfy judgments against her husband rendered prior to the acquirement of the land.

3 ———: **Fraudulent Conveyance: Fraud: Depositing Money in Another's Name.** The wife authorized her husband to sell her poultry, eggs, stock and cordwood, and deposit it in her name. He would deposit in his uncle's name "by" him, using the full name of the uncle, and his own initials only, thus, "John W. Young, by J. H. W." When she had agreed to purchase a tract of land and was ready to pay for it, he would, by his check, signed in the same way, transfer it to her, and she would draw her check in favor of the vendor. She testified that she knew nothing of this manipulation of her account and never heard of it until the trial, and her testimony was not contradicted. Neither was it shown that the husband at any time had any property of his own, and all the evidence, so far as it goes, is to the effect that the money so deposited was obtained by selling her personal property. *Held*, that there was no such fraud as would authorize a holding that the money was the husband's.

4. ———: ———: ———: ———: **Concealment: Bank Officer: Presumption.** The officers of a bank who have charge of its books and accounts are presumed to know their customers and to whom the funds deposited in the bank belong. And where the plaintiff, who sues to have deeds to the wife set aside as fraudulent on the ground that it was the husband's money which paid for them, was a director of the bank at all times the husband deposited, in the name of his uncle "by" him, using his initials, the money obtained by selling his wife's personal property, and for two years prior to bringing the suit was the bank's president, the usual rules as to concealment do not apply; but whether he was actually familiar with the manner of making the deposits is wholly immaterial as bearing on the issue of fraud, since no man who wished to perpetrate a fraud on a bank president or director would have deposited the money in the bank in such a manner.

5. ———: ———: **Mortgaging Wife's Personalty: Evidence of Ownership.** The fact that the husband with the wife's permission, or without her knowledge, mortgaged her live stock, is no evidence that the stock belonged to him. It might be evidence against him, but none against her ownership.

6. ———: ———: **Giving in Wife's Property to Tax Assessor: Evidence of Ownership and Fraud.** The fact that the husband gave to the tax assessor for assessment a list of personal property claimed by the wife, as his own, is an admission by him

that he owned it, but is not an admission against her unless she had knowledge of it. And even if she knew that it had been assessed as his, it is not conclusive evidence of fraud, and will not authorize the court to declare as a matter of law that the property belonged to him.

Appeal from Monroe Circuit Court.—*Hon. David H. Eby,* Judge.

AFFIRMED.

*Ezra T. Fuller* and *James P. Boyd* for appellant.

(1) The fact that John H. Walkup and Emma W. Walkup were husband and wife at and prior to the date of the obtaining of the original judgment by the appellant herein against the said John H. Walkup and that the land in controversy was purchased during coverture, being admitted or, at least, uncontroverted by the evidence in this cause, the presumption is that each and every tract of land in controversy was paid for by John H. Walkup, the husband. Lins v. Lenhardt, 127 Mo. 289; Seitz v. Mitchell, 94 U. S. 580. This principle has been uniformly held by this court. Ryan v. Bradbury, 89 Mo. App. 665; Sloan v. Torry, 78 Mo. 623; Patton v. Bragg, 113 Mo. 601. (2) Except where the burden is upon plaintiff because of particular allegations in the complaint, the general rule is that in a contest between the creditors of the husband and his wife, if the wife claims ownership of the property by a purchase during coverture, the burden of proof is upon the wife to show that the purchase was for a valuable consideration by her out of her own separate estate or by some person other than the husband. 20 Cyc. 754; Bank v. Wind, 132 Mo. 87; Balz v. Nelson, 171 Mo. 689; Johnson v. Christie, 77 Mo. App. 53. (3) If one is able upon an analysis of the evidence in this case to determine definitely what the contention of the respondents is, it would lead to the conclusion that the basis upon which the start and principal sum, the ac-

cumulations of which resulted in a sufficient amount to purchase the land in controversy, came by reason of a gift of poultry from J. W. Young to Emma W. Walkup, and that such gift, if any, was by parol. It may be conceded that separate estate in personal property may be created in a married woman by a parol gift, but the rule in this State is that where it is claimed that the estate of a married woman had its beginning in personal property by a parol gift, the evidence as to such gift must be clear and positive and free from any suspicion of fraud. Holthaus v. Hornbostle, 60 Mo. 442. The evidence of this parol gift does not meet the requirements of the law of this State to show it to have become the separate property of the wife. Roberts v. Walker, 101 Mo. 601; Bank v. Simpson, 152 Mo. 59; State ex rel. v. Bank, 10 Mo. App. 482; Hoffman v. Nolte, 127 Mo. 120. Nor does it rebut the presumption of fraud in such instances. Snyder v. Free, 114 Mo. 369. (4) To permit an insolvent husband, having creditors, to systematically and continuously give his wife practically all of his earnings and to allow the wife with these gifts to acquire in her own name and her own separate use, personal property and hold it exempt from the just demands of the creditors of her husband, when if the same property had been acquired directly by the husband, it would have been subject to levy, would work a gross fraud upon the husband's creditors. Johnson v. Christie, 79 Mo. App. 51; Wolfsberger v. Mort, 104 Mo. App. 261.

*Whitecotton & Grimes* and *Frank W. McAllister* for respondents.

(1) Sec. 6869, R. S. 1889, was the statute in force in 1893 when respondents moved to the John W. Young farm. Under its provision, the poultry "turned over" to respondent Emma W. Walkup by John W. Young, became and remained "her separate property" and

"under her sole control." (2) Appellant's contention that an intention on the part of J. W. Young that the property should become the separate property of Emma W. Walkup, "to the exclusion of her husband" was necessary, is without merit. Ilgenfritz v. Ilgenfritz, 49 Mo. App. 137; Goldsmith v. Taussig, 60 Mo. App. 462; Broughton v. Brand, 94 Mo. 174. The evidence very clearly indicates that the poultry was not turned over to Emma W. Walkup by Young as a gift, but was part of the consideration for her taking charge of his house, making him a home, doing his cooking, washing, ironing and mending, in fact, boarding him; but whether it was a gift or part of the consideration for services rendered Young by Mrs. Walkup, is immaterial. The statute makes no difference between property acquired by gift or purchase. In any event, the poultry and the "income, increase and profits" from it became and remained the separate property of Emma W. Walkup. (3) By the terms of the statute (Sec. 4340, R. S. 1899) the first eighty acres bought became and remained the separate property of Mrs. Walkup, and the same statute preserved to her, as her separate property, "all income, increase and profits" therefrom. The other tracts of real estate having been bought with "the income" and "profits" from the first tract, they, as well as the first tract, were purchases "with her separate means" and remained her separate property and are not "liable to be taken by any process of law for the debts of her husband." R. S. 1909, Sec. 8309; Baker v. Campbell, 32 Mo. App. 155. (4) It was but natural that her husband should have looked after the stock, fed them, taken care of them, acted as her agent in the business transactions, and that he should have assisted in cutting and hauling the cordwood. As said by him, she was not expected "to go out in the cold and feed, and me lay around and sleep with the dogs." The statute contemplates that the husband will use, occupy,

care for and protect the separate property of his wife, and provides that his use, occupancy, care or protection thereof shall not be deemed to invest him with any rights therein, and provides expressly that it shall remain the separate property of the wife unless by the terms of assent in writing full authority shall have been given by the wife to the husband to sell, incumber or otherwise dispose of the same for his own benefit. No such authority was shown or claimed in this case. Until Mrs. Walkup, in writing, gave him full authority to sell, incumber or otherwise dispose of it for his own use and benefit, it remained her separate property. Bank v. Winn, 132 Mo. 87; Broughton v. Brand, 94 Mo. 174; Winn v. Riley, 151 Mo. 66; Rogers v. Bank, 69 Mo. 563. Neither John H. Walkup, nor his creditors, acquired any sort of interest in or claim upon Mrs. Walkup's real estate or personal property by his expenditure of time and labor in its care, protection or improvement, and this is especially true as a large part of the income from her property was used for the family support. Seay v. Hesse, 123 Mo. 459; Bank v. Adair, 172 Mo. 166; Jones v. Hogan, 135 Mo. App. 363; Fink v. McCue, 123 Mo. App. 317; State ex rel. v. Jones, 83 Mo. App. 157; Gruner v. Scholz, 154 Mo. 424. (5) It is apparent from the evidence of both respondents that Mrs. Walkup understood all the time that John H. Walkup was depositing the proceeds of sales of her cordwood, stock and other property received by him, to her credit in the bank under her own name. By depositing her money to the credit of the account of "J. W. Young by J. H. W." he, at least, became her debtor to the extent of the money so deposited. This was a valid indebtedness which he had the right to pay to her, although he was insolvent. Bank v. Winn, 132 Mo. 87; Winn v. Riley, 151 Mo. 67; Grocery Co. v. Ballenger, 137 Mo. 375; Smith v. Settle, 128 Mo. App. 383. Although insolvent, Walkup had the right to pay the debt to his wife even

in preference to other creditors, including the plaintiff, and she had the right to accept payment of it, and neither were guilty of any fraud. Hart v. Leete, 104 Mo. 337. (6) Mrs. Walkup has clearly shown that the real estate in suit was purchased with her separate means, and has shown in detail the sources from which she derived the means. This overcomes the legal presumption that the real estate was paid for with her husband's means, and it devolves upon appellant to show the existence of any fraud which will vitiate her title and subject the real estate to the payment of his judgment. 20 Cyc. 754; 6 Ency. Ev., p. 93. Transactions between husband and wife will be closely scrutinized by the courts, but they are not presumed to be fraudulent, and if found to be fair and honest, will be upheld the same as transactions between other persons. Jones v. Hogan, 135 Mo. App. 363; Seay v. Hesse, 123 Mo. 464; Gruner v. Scholz, 154 Mo. 424.

WOODSON, J.—This is a suit in equity instituted in the circuit court of Monroe county by the plaintiff against the defendants, seeking to set aside and for naught hold, six certain deeds, executed by various persons, conveying as many tracts of land situate in said county, to defendant Emma W. Walkup, wife of defendant John H. Walkup, and to subject said lands to the payment of a certain judgment for $958.20, dated October 29, 1898, based upon two promissory notes, one dated May 22, 1891, for $32 due one day after date, bearing eight per cent interest, and the other dated August 9, 1892, for the sum of $700, bearing the same rate of interest, in favor of the plaintiff against the defendant John H. Walkup, upon the alleged ground that the purchase price of said lands was owned and paid by John H. Walkup, the husband and the title thereto was taken in the name of Emma

W. Walkup, his wife, for the purpose of hindering, delaying and defrauding his creditors.

The record in the case is quite voluminous, covering about two hundred and fifty printed pages. To state even the substance of the testimony of the various witnesses would unnecessarily prolong the statement of the case, and the opinion which is to follow. We will, therefore, do the next best thing which the nature of the case will permit, and that is, to briefly state what the evidence tends to prove, and then emphasize the weak and strong points in the case, and point out the evidence which tends to corroborate or disprove the same.

In passing, however, we might add, that the evidence in this case, like that in most of its kind, is largely drawn from the lips of the defendants, and consequently there is not much conflict in the testimony, but the deductions to be drawn therefrom and the rules of equity governing the same greatly vary, and constitute the real grounds upon which the respective parties to the action stand, and upon which they wage the legal battle.

The following tracts of real estate constitute the land in controversy and were acquired by defendant Emma W. Walkup from the following named persons, upon the following dates and in consideration of the following sums, to-wit: Eighty acres from Julia E. Mudd, by deed dated April 10, 1902, in consideration of $350 paid and a pair of old mules valued at fifty dollars; four and seven-tenths acres from Edward H. O'Daniel, by deed dated February 8, 1906, in consideration of forty-seven dollars; forty acres from William M. McCreery et al., by deed dated November 10, 1906, in consideration of $510; 113 acres from John W. Young, by deed dated March 7, 1907, in consideration of $3390; forty acres from Samuel M. Locke, by deed dated June 20, 1907, in consideration of $200;

246 Mo.—18

and forty acres from Thomas F. Hurd et al., by deed dated July 1, 1907, in consideration of $275.

Emma W. Walkup never inherited any property from her father or any one else, nor did she own any property at the time of her marriage to John H. Walkup, nor at the time they moved to the farm of John W. Young, to be presently noted.

All of this land, except the 113 acres, was very rough and broken, covered with small timber and brush and was unfit for cultivation, only valuable for grazing purposes.

At the time of the trial the 113 acres were worth thirty dollars per acre, and all the remainder was worth about ten dollars per acre.

Mrs. Walkup borrowed from a Mrs. Glenn the entire $350, with which she paid for the Mudd tract and secured the loan by deed of trust on the land. She paid Mrs. Glenn said $350 on November 10, 1906.

The entire purchase price of the 113 acres, $3390, was borrowed by Mrs. Walkup from the Bank of Stoutsville, and she secured the same by a deed of trust on that and all the other land mentioned, which cost her about $1600. None of the $3390 so loaned had been paid at the date of the trial.

Prior to July, 1893, John H. Walkup had been engaged in the live stock and livery business in the little town of Florida, Monroe county, at which time he failed, and practically all of his property was taken by his creditors and sold to pay his debts, leaving about $3500 of indebtedness unpaid.

In July, 1893, defendants moved to the farm of John W. Young, an uncle of John H. Walkup. At that time his entire possessions consisted of a cow, an old pony, a second hand wagon, a set of buggy harness, the family household and kitchen furniture, and eighteen head of mules which were mortgaged to said John W. Young for more than they were worth, and afterwards sold for several hundred dollars less than

the amount of the mortgage. The cow died shortly after they moved to Young's farm. The household and kitchen furniture was worth about fifty dollars, the harness twenty dollars, and the pony fifteen dollars.

John W. Young was an old bachelor and lived alone when defendants moved to his farm. Emma W. Walkup after moving there kept house for him, did his cooking and all other duties pertaining to the household. In other words, all of them lived together as one family, defendants paying no rent and Mr. Young paid no board.

When defendants went to live with Mr. Young he turned over to Mrs. Walkup all the poultry which was then on the farm, and gave her the use of nine good milk cows. The next year Mrs. Walkup added to the poultry some turkeys, geese and ducks, but just how many is not shown. John H. Walkup had nothing to do with the poultry, except at times to assist his wife in marketing the same. She used a part of the proceeds of the sales of poultry in supporting the family, and a part of the proceeds were deposited in her name in the Bank of Stoutsville.

At one time Mrs. Walkup exchanged some ducks to Lon Hughes for a pig, which, with its increase, was kept on the farm for several years. From those came the stock of hogs which was on the farm at the date of the trial, which at all times belonged to Mrs. Walkup. A few years prior to the date of the trial, John H. Walkup, as the agent of Mrs. Walkup traded some of the hogs to a man by the name of Green for a small bunch of sheep, and from this start the sheep on the farm at the date of the trial sprang. None of the sheep ever belonged to her husband. About this same time, Mrs. Walkup, out of the proceeds of the sales of poultry, eggs and butter, purchased a small bunch of black heifer calves, the number not stated.

From the time defendants moved upon the farm of Mr. Young, up to April 10, 1902, the date of the

purchase of the first piece of land by Mrs. Walkup, John H. Walkup, her husband, was doing general farm work upon the farm.

The farm was largely in grass, except a small piece of timber. Neither of the defendants cultivated any of this land, but John H. Walkup rented and cultivated a piece of ground adjoining and raised small crops thereon for a year or two.

Mr. Young permitted John H. Walkup to cut some wood from the piece of timber on his land, which from time to time he hauled to Stoutsville and sold for $1.50 per cord. The proceeds of those sales were expended for living necessities.

Some time prior to April 10, 1902, a man by the name of Turnbaugh owed Mrs. Walkup a board bill, and in settlement thereof he gave her a mare "pretty badly crippled." Later she traded the mare to a Mr. Gaston for a mule, and gave him ten dollars "to boot." The ten dollars was hers, the proceeds of sales of turkeys and chickens; and later she sold more turkeys and chickens, from which she realized twenty-five dollars, and purchased therewith another mule.

In the spring of 1902, Mrs. Walkup purchased the first tract of land, eighty acres, from Mrs. Mudd, and paid for the same with the $350 she borrowed from Mrs. Glenn, and the two mules last before mentioned. This land was covered with small timber, the big timber having been cut off years before. Shortly after purchasing it she began to fence and clear the land. She cut therefrom between eight or nine hundred cords of wood and sold most of it at $3.50 per cord. John H. Walkup did part of the chopping and hauling of the wood to market, but the greater part thereof was done by hired labor and the cost thereof was paid from the proceeds of the sale of the wood. This wood was cut and sold between the years 1902 and 1907. Part of the proceeds of the sale of this wood and the sales of poultry, eggs and butter provided the largest

part of the living expenses for the family. Most of the live stock and its increase was kept on the farm, but occasionally a few hogs were sold on the market.

For some time prior to 1902, down to the date of the trial, Mrs. Walkup had an account with the Bank of Stoutsville. All the land purchased by Mrs. Walkup was paid for by checks drawn on her account in said bank, signed by her.

She testified that all the money received from the sales of her poultry, eggs, butter, live stock and wood, except what was paid out for family expenses, etc., was deposited either by herself or by her husband to her credit in said bank.

This testimony of Mrs. Walkup is contradicted by the books of the bank. They show that there was another account kept in said bank under the name of "J. W. Young by J. H. W." The deposits in this account were rather frequent and were for considerable amounts, and were made by John H. Walkup and the checks against this account were usually drawn by him. John H. Walkup frequently without the knowledge of his wife, deposited money arising from the sale of poultry, stock and cordwood, belonging to her, in the account of "J. W. Young by J. H. W.," and whenever Mrs. Walkup purchased a piece of land, John H. Walkup would, without her knowledge, draw a check against the account standing in the name of "J. W. Young by J. H. W." and deposit it in said bank to the credit of Mrs. Walkup, and she would draw a check against her account in said bank in favor of the person from whom she had purchased the land, in payment thereof. In other words, John H. Walkup, without the knowledge of his wife, would, when selling her property, collect the proceeds of the sales and deposit them to the account "J. W. Young by J. H. W.," and whenever she purchased a piece of ground he would draw a check against said account and deposit it in said bank to the credit of his wife, and then she would

draw her check against her account in favor of the person from whom she had purchased the land. She had no knowledge of this shifting of accounts made by her husband.

There was at no time any money deposited to the account of "J. W. Young by J. H. W." which was not the proceeds of sales of property belonging to Mrs. Walkup. Nor is there any evidence which tends to show that she had any knowledge of the existence of said account or that her money was being deposited in that or any other account than her own. She understood and believed that the proceeds of the sales of all her property, made by her husband, were being deposited by him in her name; and so believing she drew checks against her own account in payment of land purchased by her or in payment of any other of her indebtedness.

J. W. Young had an account of his own in said bank, in which he deposited his own money.

The plaintiff in this case was, for several years prior to the year 1902 and down to the date of the trial, a member of the board of directors of the Bank of Stoutsville, the bank in which all these accounts were kept, and for a year or two just preceding the trial he was the president of said bank.

John H. Walkup was shown to have had some horses, mules and a few head of cattle on the farm of John W. Young, or at least he claimed he owned them, but whether they were the same as those claimed by Mrs. Walkup is not made clear by the evidence.

But the evidence is clear that on several occasions he borrowed money and gave chattel mortgages on Mrs. Walkup's live stock to secure the loan, sometimes with her consent and at other times without her knowledge. That the money thus borrowed was generally used in purchasing other live stock. That from the date of the failure of John H. Walkup to the date of the trial, he had paid off and discharged more than

$3000 of his old indebtedness, and that the greater part thereof was paid off with money belonging to his wife, the proceeds of sales of her live stock and from the products of her real estate, the exact amount thereof not appearing, but he testified that it was considerably more than she had used in the purchase of real estate.

That respondent John H. Walkup assisted in the care of the real estate, that he attended to and fed the stock, that he assisted in cutting and hauling the cordwood and in clearing and fencing the land, and that he acted as respondent Emma W. Walkup's agent in the transaction of most of the business, buying, selling and trading stock, marketing the poultry, stock and cordwood, and collecting the proceeds for her.

That respondent, John H. Walkup, on several occasions gave in to the county assessor, for taxation in his own name, all the personal property on the premises, including that of respondent, Emma W. Walkup, and also sometimes the property of John W. Young. It does not appear from the evidence that Mrs. Walkup knew anything about the property being listed by the assessor in the name of John H. Walkup, or that she in any way consented to it.

It was not shown and it is not claimed by appellant that respondent, Emma W. Walkup, at any time gave her husband, respondent John H. Walkup, authority or assent in writing to sell, encumber or in any manner dispose of any of her personal property.

It is not shown and plaintiff made no effort to show that respondent, John H. Walkup, had any means of his own or that he received money from any source prior to the purchase of the first piece of real estate which was July 1, 1907, except from the sales of stock or other products of real estate involved in this suit, which Emma W. Walkup claims as her separate property.

It appears in evidence that respondent Emma W. Walkup, had no knowledge of plaintiff's judgment

against respondent John H. Walkup, until the bringing of this action, and that she thought his indebtedness to plaintiff had been paid long before the year 1902.

Upon the evidence introduced, the trial court found issues in favor of the defendants, and rendered judgment accordingly for them, and denied the relief asked by the plaintiff. After the motion for a new trial was overruled the plaintiff duly appealed the cause to this court.

Numerous errors are assigned, but we will only consider those bearing upon the merits of the case.

I.   It is not contended by counsel for appellant that their case is made out and supported by the weight of the direct and positive evidence in the case, but, if we correctly understand their position in that respect, they tacitly, at least, concede, that the direct and positive testimony in the case is against their theory of the case.  But be that true or false, counsel for appellant plant their case squarely upon a presumption of law, presently to be noted, supported and strengthened as they contend by certain undisputed facts in the case, which they state in connection with said presumption.

The contention of counsel for appellant is clearly stated in the following language, viz:

"The fact that the respondents John H. Walkup and Emma W. Walkup, were husband and wife at and prior to the date of the obtaining of the original judgment by the appellant herein against the said John H. Walkup, and that the land in controversy was purchased during coverture, being admitted, or at least uncontradicted by the evidence in this case, the presumption is that each and every tract of land in controversy was paid for by respondent John H. Walkup the husband."

Counsel for appellant in various ways and in different language restate the foregoing legal proposition, as well as certain well-known rules of evidence which, if resorted to by the court would, as they contend, lead to the conclusion above stated.

For convenience and brevity, we will consider all of those matters under the one proposition before stated.

Before going directly to the consideration of the presumption above stated and relied upon by counsel for appellant to make out their case, it may not be out of place in this connection to state that said presumption grew out of and originated under the common law governing domestic relations.

Briefly, under that law, the husband and wife were considered one, that is, one person; and the law gave to the husband an estate by curtesy in all of the real estate of which the wife was seized during coverture; it also gave to him all of her personal property and so much of her choses in action as he reduced to possession during the marital relation (which was generally all of them), and under the common law the wife had no capacity to contract; consequently, the law having divested her of all property she had at the time of her marriage, and she having no capacity to contract for or purchase other property, and even though she had in any manner acquired other property, real, personal or mixed, barring uses and trusts, it would, under that law, have passed to and become the property of the husband in the same manner that her original estate passed to him at the date of the marriage; therefore, very naturally the law raised a presumption that, where the wife held the title to real estate or personal property during coverture, the husband paid for the same, and took the title thereto in her name, for the reason that as a rule she had no other way to acquire it. That presumption has been recognized and enforced by the courts of this State

and most of the other states of the Union, as well as by the courts of the United States. [Lins v. Lenhardt, 127 Mo. 271; Sloan v. Torry, 78 Mo. 623; Patton y. Bragg, 113 Mo. 601; Seitz v. Mitchell, 94 U. S. 580.]

The conditions that existed under the common law and which gave birth to that presumption, no longer exist in this or in any of the other states, in so far as my knowledge extends. By Sec. 8304, R. S. 1909, a married woman is empowered to contract, carry on business in her own name, and to sue, and be sued, as a *femme sole;* and by Sec. 8309, R. S. 1909, it is provided that all real estate and personal property, including rights in action, belonging to any woman at the time of her marriage or which may have come to her during coverture, by gift, bequest or inheritance, or by purchase with her separate money or means, or be due as the wages of her separate labor or growing out of any violation of her personal rights, shall together with all income, increase and profits thereof, be her separate property and not liable for her husband's debts. The enactment of both of these statutes antedate the matters and things involved in this litigation.

If we adhere to the wise maxim, that the reason of the law is the soul of the law, and that when the reason of the law ceases, then the law itself ceases, we should attach but little if any importance to the presumption before stated, invoked and relied upon by counsel for appellant, to make out and sustain his case. But give to that veteran presumption, which has served a good and useful purpose in the past, but which has been practically, if not totally abolished, by necessary implication through the enactment of the wise and just statutes governing married women, in this and other states, all the weight it is entitled to, nevertheless, we are of the opinion that appellant has wholly failed to make out and support his case for the reason that this record shows affirmatively that the

respondent, John H. Walkup, was himself totally insolvent and had no money or means with which he could have purchased and paid for the lands or any part thereof, involved in this litigation; nor does the evidence show that he earned, accumulated, inherited or otherwise acquired the money or means with which it was paid for.

But upon the contrary the only direct and positive evidence in the case bearing upon that point shows that Emma W. Walkup, the wife of John H., "was the better man of the two," and that by the exercise of good judgment, hard labor and strict frugality, she was enabled to support the family and save and add to the small donation given to her by Mr. Young when she and her husband went upon his farm to live. Everything she put her hands to turned into gold; and after a few years she had acquired several small pieces of real estate, worth, less the incumbrances thereon, about $1600.

She also accumulated considerable live stock, poultry and other personal property, about the farm, besides paying off about $3000 of her husband's old debts, incurred by him while he steered their ship of fortune.

Not only that, but the uncontradicted evidence shows that Mrs. Walkup purchased and paid for the Mudd tract of land with her own means, and from that she sold some eight or nine hundred cords of wood at $3.50 per cord, which amounted to somewhere between $2800 and $3200.

This was the only money of any consequence that the evidence shows either of them ever had and clearly this was the foundation of all their subsequently acquired property. The proceeds of the sales of poultry, eggs, butter, etc., went largely to buy calves, lambs, pigs and other poultry, and what was not expended in that way was expended for the necessities of life.

And I might add, that there is not a scintilla of evidence to be found in this record which tends to show that any of said poultry ever, at any time, belonged to John H. Walkup; but upon the other hand the evidence is uncontradicted that John W. Young gave to Mrs. Walkup the first lot of poultry she ever had, and all that which was subsequently found on the premises was the issue of the original stock given to her by Mr. Young.

Under the statutes before mentioned, all the real estate and personal property, as well as the issues, rents and profits thereof, which Mrs. Walkup earned during coverture, belongs to her, and it cannot be taken to satisfy her husband's debts.

Counsel for appellant lay much stress upon the fact that John W. Young had an account of his own, in his own name, in the Bank of Stoutsville, that John H. Walkup had one in his own name, and one in the name of "John W. Young by J. H. W.," and that Emma Walkup had one in her name; and the fact that John H. Walkup frequently deposited money to the account of "John W. Young by J. H. W.," and would, whenever his wife purchased a piece of land and went to pay for it, draw a check upon the "John W. Young by J. H. W." account, and deposit it to the account of Emma W. Walkup, his wife, and that she would then draw her check on her own account in payment of the purchase price thereof. This juggling of accounts between them, it is insisted, is evidence of fraud on the part of both Mr. and Mrs. Walkup. That is, that by depositing the money in the account of "John W. Young by J. H. W." would conceal the fact that either of them had any money in the bank, and that the transfer of the money from the "John W. Young by J. H. W." account to the Emma Walkup account, and the drawing of the check by her on the latter account in favor of the vendor of the land would conceal the fact that John H. Walkup was paying the pur-

chase price, and at the same time make it appear to the outside world tht Mrs. Walkup was paying for it with her own money.

This evidence if standing alone and unexplained would carry considerable probative force, but explained as it is, we attach but little importance to it. In the first place, Mrs. Walkup testifies that she never knew or heard that there existed in the bank the "John W. Young by J. H. W." account, or that her husband had ever deposited her money in that account. She testified that she directed him to deposit her money in her own account, that she supposed up to the day of the trial of this cause that he had always done so; and so believing, whenever she purchased land or wished to pay for anything else, when she did not have the money, she always drew a check on the bank against her own account.

This testimony of hers is not contradicted by any of the bank officers who had charge of the books and accounts of the bank and who are presumed to know their customers and to whom the funds deposited in the bank belong.

But independent of that, it is undisputed that the appellant had been for a number of years a member of the board of directors of this bank, and for a year or two just before the institution of this suit he was the president thereof, and presumably was perfectly familiar with the condition of its accounts; but whether he was actually familiar with them or not, is wholly immaterial for the reason that no person, man or woman, who has any sense whatever, who wanted to perpetrate a fraud upon a person, would go to the bank of that person and open up a series of accounts therein which would expose and lay bare the fraudulent scheme by which the fraud was to be perpetrated. The mere statement of such a proposition condemns its sanity.

Counsel also lay much stress upon the fact that John H. Walkup upon one or two occasions mortgaged some of his wife's live stock.

The evidence shows that he did so once or twice without her knowledge, and at other times with her consent. He should not have done so without her knowledge, and permission; but the fact that he did so with or without her knowledge or consent, did not injure appellant; nor does he so contend, but he insists that the mere fact that he mortgaged them is evidence of the fact that he owned the stock so mortgaged.

Now, can that be? Certainly not, if he got her permission to mortgage them, and equally true, if she had no knowledge of the fact that he had done so. That might be evidence against him, but not against her. That still left the question of ownership of the property open to be proved or established by competent evidence.

Counsel lastly insist that the fact that John H. Walkup gave to the assessor for assessment a list of the personal property claimed by the wife, as his own, is evidence of fraud.

Concede that said act is an admission of ownership as against him, it is no evidence against her whatever, unless it was shown that she had knowledge of the fact, and the record in this case fails to disclose that knowledge. But concede that she had knowledge thereof and that it was evidence of fraud, nevertheless, it was not conclusive evidence of fraud. The question of the ownership of the property in this class of cases is still a question of fact for the court to determine upon all the evidence in the case, and not one of estoppel. It is not an uncommon thing for a husband, with or without the knowledge of the wife, to give in her property in his own name for taxation. I dare say that it is given in that way more frequently than it is given in in her own name. And it

is a well-known fact that in the great majority of cases it is done in that way for convenience or thoughtlessly. The husband wishing to pay the taxes on his wife's personal property, never thinks of making out a separate list of her property, nor as a rule does the question of fraud enter his mind. From a sense of duty and a spirit of generosity towards his wife, springs the desire to pay her taxes and other obligations and for convenience merely he includes her property in his list. This is common knowledge, and to hold as a matter of law that such conduct is fraudulent in this class of cases would stamp the seal of disapproval upon one of the noblest and most generous spirits that abides in the human heart. I am not saying that such conduct may not be the result of a fraudulent design, or that it may not be evidence of fraud where credit has been extended upon it, but what I do say is this: that it is but one fact or circumstance which tends to show fraud, but standing alone and uncorroborated by other facts and circumstances indicating a fraudulent intent is itself insufficient for that purpose. Evidently this was the view the trial court took of the matter and caused him to find for the respondents.

In our opinion that finding was right, and the evidence in this case was insufficient to sustain the allegations of the petition. So believing, we are of the opinion that the judgment should be affirmed. It is so ordered. All concur.